THE NORTHWESTERN NATIONAL BANK OF CHICAGO, *Appellant*, v. THE BANK OF COMMERCE OF KANSAS CITY.

DIVISION TWO.

1. **Bills and Notes** : DRAWER AND DRAWEE : ESTOPPEL. The drawee of a bill of exchange or draft is, as a general rule, bound to know the handwriting of the drawer, and, if he pays it in the hands of a *bona fide* holder for value, he is concluded by the act, although it turns out to be a forgery.

2. ———— : INDORSEMENT FOR COLLECTION : NEGOTIABILITY OF DRAFT. An indorsement of a draft for collection limits the effect which would have been given to a general or blank indorsement, and warns persons dealing with it that there is no intent to transfer the ownership or proceeds of the draft.

3. ———— : ———— : ———— : NEGLIGENCE OF HOLDER. The evidence examined, and *held*, that defendant bank was not negligent in its dealings with the payee of the draft in question before or after its presentation. that it was a *bona fide* holder of the same for value, and by its indorsement of it "for collection" it only guaranteed the genuineness of the payee's signature, and retained title until payment by the drawee, which the latter had notice of by the indorsement, and an action would not lie by the drawee to recover the amount of the draft.

*Appeal from    Jackson    Circuit Court.*—HON. T. A. GILL, Judge.

AFFIRMED.

*C. O. Tichenor* and *Lathrop, Morrow & Fox* for appellant.

(1) It is well settled that money paid under a mistake may be recovered back. *Bank v. Bank*, 55 N. Y. 211 ; *Ins. Co. v. Walsh*, 18 Mo. 229 ; *Koontz v. Bank*, 51 Mo. 275 ; *Morrow v. Surber*, 97 Mo. 155. (2) The exception to the above rule is that the drawee is bound

to know the signature of the drawer, and if he accepts or pays he is without remedy. Lord MANSFIELD said in *Price v. Neal*, 3 Burrows, 1354, that plaintiff could not recover, " unless it be against conscience in defendant to retain it." *Smith v. Evans*, 6 Taunton, 82 ; *Wilkinson v. Johnson*, 3 Barn. & C. 436. ( 3 ) Defendant paid the money to Lynch on this draft on the twenty-fourth. It was not presented to plaintiff until the twenty-sixth, and defendant's account with its correspondent at Chicago was not credited with the proceeds until that date. Defendant never acted on anything done or said by plaintiff in reference to the draft. If the money is repaid, defendant is exactly where it was the moment before the draft was paid. The loss occurred before the plaintiff saw the draft. Why say the plaintiff is liable therefor, when it never did an act or said a word tending to cause it ? *McKleroy v. Bank*, 14 La. Ann. 462 ; *Bank v. Bank*, 26 La. Ann. 399 ; *Ellis v. Ins. Co.*, 4 Ohio St. 628 ; *Bank v. Bank*, 55 N. Y. 215 ; *Lawrence v. Bank*, 54 N. Y. 435 ; *Hardy v. Bank*, 51 Md. 589. " And the mistake of the drawee should always be allowed to be corrected, unless the holder, acting upon faith and confidence induced by his honoring the draft, would be placed in a worse position by according such privilege to him." 2 Dan. Neg. Inst., p. 337. ( 4 ) The draft when paid bore, not only the indorsement of John Whitney, but that of defendant. By the latter its negotiability was destroyed. *Bank v. Company*, 70 Mo. 634. Defendant's indorsement was not necessary. It was not selling the draft and John Whitney's name was on its back. Without evidence it is plain that defendant's indorsement must have had weight with drawee when it paid the draft. If the drawee had doubts, this would tend to remove them. *Bank v. Ricker*, 71 Ill. 439. It would have a tendency to mislead and throw the officers off their guard, and cause them to accept and pay the draft without subjecting it to the same scrutiny as if it had been indorsed

and presented by a stranger. *Rouvant v. Bank*, 63 Texas, 610. It was a guaranty of the validity of the signature of the drawee, and plaintiff had the right to believe that the indorser was known to defendant by proper inquiry. *Bank v. Bank*, 151 Mass. 280; *Bank v. Bank*, 88 Tenn. 299. The name of John Whitney was fictitious. That name was signed on the back of the draft with the intent to defraud. This is forgery. 2 Dan. Neg. Inst., p. 326. Acceptance of a bill admits signature of a drawer, but it is no proof or admission of indorsement by payee. *Williams v. Drexel*, 14 Md. 566. It is not the duty of drawee to ascertain the genuineness of payee's indorsement ; the subsequent indorsement is a warranty of that fact. *Bank v. Bank,* 91 N. Y. 79. (5) The drawee having greater means of knowing the handwriting of drawer, the law presumes he knew it. From this arises an obligation which may prevent his recovering back money paid under a mistake of fact, but that does not arise if the party receiving has in any way contributed to the fraud or mistake. If the party knew of the forgery, took the paper under suspicious circumstances, without proper precaution, or if his conduct has been such as to mislead or to induce him to pay without the usual scrutiny or precaution against fraud or mistake, then drawee can recover. *Bank v. Bank*, 106 Mass. 444 ; *Ellis v. Ins. Co.*, 4 Ohio St. 628 ; *Bank v. Bank*, 22 Neb. 773. (6) Defendant does not complain of any delay in receiving notice of the forgery. To complain, it must have been damaged by the delay. *Ellis v. Ins. Co.*, 4 Ohio St. 628 ; *Goddard v. Bank*, 4 Comst. 151 ; *Bank v. Bank*, 151 Mass. 280 ; *Bank v. Bank*, 22 Neb. 773 ; *Bank v. Allen*, 59 Mo. 315.

*Karnes, Holmes & Krauthoff* for respondent.

(1) The authorities have conclusively established the proposition that the drawee of a check is bound to

know the signature of his customer. It follows from this that money paid on a forged check by its drawee cannot be recovered back. The drawee in such case will not be permitted to allege his own want of knowledge of the drawer's signature, nor his own failure to discover the forgery, to have been an innocent mistake for the consequences of which another party is to be held liable. *Stout v. Benoist*, 39 Mo. 277 ; *Bank v. Allen*, 59 Mo. 310 ; *United States v. Bank*, 45 Fed. Rep. 163 ; *Bank v. Bank*, 13 N. Y. Supp. 411 ; *Bank v. Yost*, 11 N. Y. Supp. 862 ; *Shipman v. Bank*, 13 N. Y. Supp. 475 ; *Hoffman v. Bank*, 12 Wall. 181 ; *Bank v. Bank*, 30 Md. 11 ; *Bank v. Bank*, 10 Vt. 141, 146 ; *Levy v. Bank*, 1 Binney, 27 ; s. c., 4 Dallas, 234 ; *Bernheimer v. Marshall*, 2 Minn. 78 ; *Bank v. Bank*, 35 How. Pr. 412 ; *Bank v. Bank*, 10 Wheat. 333. *First.* The rule of a forged indorsement has no application here. *Bank v. Bank*, 30 Md. 11 ; *Hortsman v. Henshaw*, 11 How. 177 ; *Cooper v. Meyer*, 10 B. & C. 468. *Second.* The indorsement of the check by the defendant to its Chicago correspondent for collection imported no guaranty by the defendant that the paper was genuine. *Bank v. Bank*, 30 Md. 11 ; *Bernheimer v. Marshall*, 2 Minn. 78 ; *Hook v. Pratt*, 78 N. Y. 371 ; *Bank v. Yost*, 11 N. Y. Supp. 862. *Third.* The fact that the check in question came through a clearing house cannot excuse the plaintiff, nor give it greater rights than it would otherwise have had. *Bank v. Bank*, 35 How. Pr. 412 ; *Bank v. Bank*, 30 Md. 11. *Fourth.* Nor will it do for the plaintiff to say, that it had a right to rely upon the fact that the defendant had exercised due care to ascertain that the check was genuine, and that consequently it (the plaintiff) was relieved of the duty to examine the signature when the paper came to its banking house. *Howard v. Bank*, 28 La. Ann. 727. "The defendant owed the plaintiff no duty, imposed by custom or otherwise, to inquire into the genuineness of the check." *Bank v. Savings Inst.*, 62 Barb. 101 ;

*Bank v. Bank*, 30 Md. 11 ; *Bank v. Bank*, 13 S. W.
Rep. 339. ( 2 ) Defendant was not negligent in paying
the check.     It cannot be held liable for circumstances
in Whitney's life or habits which it had no notice
of at the time it had its dealings with him.     *Dodge
v. Bank*, 20 Ohio St. 234 ; *Bank v. Bank*, 10 Vt. 141.

THOMAS, J.—On the seventeenth day of December,
1885, a man calling himself John Whitney presented to
the paying teller of defendant bank the following
letter :

"CITIZENS' BANK OF NEVADA, }<br>
NEVADA, MO., 12–16–85. }

" *To Bank of Commerce, Kansas City, Mo. :*
"This will introduce to you Mr. John Whitney,
who holds our certificate of deposit for $350 of this date.
He will want to draw the money there.     Below we give
his signature for identification.

" Yours truly,

"JOHN WHITNEY.          O. K. CALDWELL,
"Cashier."

Whitney, when at the bank, acted in the ordinary
way, and there was nothing about his manners or looks
that attracted the attention of the officers of the bank.
He left the certificate of deposit for $350, receiving $50
cash, and a credit for the balance.     He rented a room
on Main street in Kansas City.     On the twentieth day
of December he advertised in the Kansas City *Times*
for a book-keeper. and on the twenty-second of that
month one H. P. Brown, who went to that city in
October in the same year, applied to Whitney for
employment. When Brown reached Whitney's office
it was wholly unfurnished, but on the same day
Whitney bought a table, two chairs and some writing
material.     Brown was employed at $15 per week and
expenses while away.     Whitney informed him that
he had ordered office furniture from Chicago and took
him to the defendant's bank and introduced him

as his book-keeper to the officers, stating he was engaged in the cattle business, would need a good deal of currency and would probably send checks by Brown to be cashed, and which the bank should cash when presented by him. In the afternoon of the same day, Whitney handed Brown two checks for $3,500 each, drawn by the United States National Bank of Omaha, on a New York bank in favor of Whitney, and directed him to deposit one with the defendant and the other with the Citizens' National Bank, which was done. The next morning Whitney drew two checks of $2,500 each, one on defendant and the other on the Citizens' National Bank, both payable to the order of Brown. These were paid and the money given to Whitney about ten o'clock in the morning. In the afternoon of the same day ( December 23 ), Whitney handed Brown a draft of which the following is a copy :

"$4,000.

"UNITED STATES NATIONAL BANK OF OMAHA,
        "OMAHA, NEBRASKA, December 21, 1885.

"If duplicate unpaid, pay to the order of John Whitney $4,000, in current funds.

        "M. T. BARLOW,
                "Cashier.

" *To Northwestern National Bank, Chicago, Ill.*
"No. 211,573.          pp. C. WILL HAMILTON.
"( Indorsed ).          JOHN WHITNEY."

with direction to deposit it in the defendant bank, which was done and the amount, $4,000, duly placed to the credit of Whitney.

Defendant immediately indorsed this draft as follows:

"Pay Metropolitan National Bank, Chicago, or order for collection, for account of the bank of Commerce of Kansas City, Missouri.

        "C. J. WHITE,
                "Cashier."

And sent it to the latter bank at Chicago.    On the morning of December 24, Whitney drew a check for $4,500, on defendant, payable to Brown which was at once presented by Brown and paid, the proceeds being given to Whitney.    At half past twelve that day Whitney disappeared from Kansas City and was never afterwards seen there.    He told Brown he had been called, by telephone, to Nevada, Missouri, to buy stock, and wanted Brown to go to Nevada on Christmas night or the next morning, giving him $75 to pay his expenses and a week's salary.    Brown went to Nevada on the morning of the twenty-sixth, and staid all day, inquiring for Whitney, but, being unable to learn anything about him or who he was, he returned to Kansas City that night, it being Saturday night.    He went to the office next morning but found no one there.    He went again Monday morning, December 28, and again finding no one, he went to the defendant and inquired for him, but the officers of the bank knew nothing of him.    He continued to go to the Whitney office for about a week. The draft of $4,000 reached Chicago December 25, and on the next day, December 26, it was presented to and paid through the clearing house by the Northwestern National Bank (the plaintiff) to the Metropolitan National Bank, and the proceeds duly placed to the credit of defendant on the books of the Metropolitan National Bank.

The items paid by plaintiff on the twenty-sixth through the Chicago clearing house were fourteen hundred and twenty-five in number, amounting to nearly $442,000.    Its average daily clearing was about $300,000 ; while the entire amount paid daily through the clearing house was about eight and one-half millions.

The clearings are made at eleven A. M., and the items are received by the bank as soon as the messenger can make the exchanges and get back, which takes about half an hour.    The items cannot be examined at the

clearing house. This must be done by the bank, and such items as it is not desired to pay must be returned to the bank sending them before two P. M. There is not time, under the rule, to make a critical examination of every item paid in this way.

On December 26, plaintiff paid thirty-one other drafts of the Omaha bank. The $4,000 was charged to this bank, and was sent to it, in the regular course, with other vouchers on January 4. On the eleventh said bank, by letter and wire, notified the plaintiff of the forgery. The telegram was received too late, so that notice was not given the Metropolitan Bank until the next day. Plaintiff through that bank at once gave notice to defendant. The forgery was a very dangerous one; the officers of the Omaha bank, as well as the clerk, whose name was signed to the draft, at first thought it was genuine. They say it must have been lithographed on the original plate of their drafts.

There was evidence showing that the channel through which a draft is presented for payment makes a difference with respect to inspection, that, in dealing with responsible parties, their prudence and care is relied upon; that a draft paid through the clearing house does not receive as close inspection as when presented over the counter by the payee. The evidence also tended to show that the letter of the cashier of the Nevada bank was a sufficient identification of Whitney to justify a prudent bank to deal with him in the ordinary course of business.

Whitney was traced by detectives to New York, where it was ascertained he had been sent to the penitentiary for five years from Rochester in April, 1886, for forgery. It was learned his true name was David Lynch, but he was sent to the penitentiary under the name of George Edmonds. Whitney left $550 to his credit in the defendant bank, of which the plaintiff received $280, and the New York bank $270.

Upon these facts the plaintiff, by this action, seeks to recover from the defendant the sum of $3,720, and interest, the amount lost on the forged draft. The circuit court of Jackson county directed the jury to return a verdict for defendant, whereupon plaintiff took a nonsuit with leave, etc. The court having refused to set aside this nonsuit, plaintiff appealed to this court.

Before proceeding to analyze the evidence to determine whether the court erred in forcing plaintiff to a nonsuit we will take our legal bearings and ascertain the principles of law we must apply to the facts in the case.

The general rule is that the drawee of a bill of exchange or draft is bound to know the handwriting of his customer, the drawer, and if he pays a bill or draft in the hands of a *bona fide* holder, for value, he is concluded by the act although the bill or draft turns out to be a forgery. This rule was first announced by Lord MANSFIELD in *Price v. Neale* ( 1762 ), 3 Burrows, 1354, and has been followed and approved by the English courts, and an overwhelming majority of the American courts, including the surpeme court of the United States and of this state. *Bank v. Bank*, 13 N. Y. Supp. 411 ; *Bank v. Yost*, 11 N. Y. Supp. 862 ; *Stout v. Benoist*, 39 Mo. 277, and cases cited ; 4 Harvard Law Review, 297. See 3 Am. & Eng. Ency. of Law, 222, where the English and American authorities are collated.

It is also well settled that an indorsement of a draft for collection limits the effect which would have been given to a general or blank indorsement, and warns parties dealing with it, that there is no intent to transfer the ownership or proceeds of the draft. *Bank v. Company*, 70 Mo. 643; *Bank v. Company*, 4 Mo. App. 200, and cases cited.

With these legal principles for our guide, let us see if the defendant was a *bona fide* holder for value of the draft of $4,000, at the time the plaintiff paid it. If it was, the loss must fall on the latter. It is conceded

defendant paid *full* value for this draft, but plaintiff's contention is, that it is not a *bona fide holder* of the draft, because it was not prudent in its dealings with Whitney in failing to inquire more particularly who he was.    Defendant's conduct must be judged from the standpoint it occupied during these transactions, and from the circumstances as they presented themselves to it at that time.    We know much now that the officers of the bank did not know then.    We know that the true name of the man, calling himself Whitney, was David Lynch.    This the bank officers did not know. We know that Whitney's office was substantially unfurnished.    This the bank officers did not know.    We know that Whitney was a criminal, and that the drafts he deposited were forgeries.    This the bank officers did not know.    But the evidence shows that Whitney and Brown were strangers to the bank officers.    Whitney brought a letter of introduction from the cashier of the Nevada bank showing his genuine signature.    He went to the defendant, presented this letter and a certificate of deposit of $350 given by the Nevada bank.    He drew $50 cash and left $300 of this certificate on deposit with defendant.    He was neatly dressed, and had the appearance of an ordinary business man,  He did nothing, said nothing to attract attention.    When he left on December 24, he had a deposit with defendant of $550, which he never drew out.    The evidence all shows that the letter of the cashier of the Nevada bank was a sufficient identification of Whitney to justify defendant in dealing with him in the customary way, and there is no question that defendant cashed Whitney's drafts as drafts are usually cashed in the ordinary course of business.    The drafts handled by Whitney were so well executed on the blanks of the Omaha bank, that the officers of this bank first thought they were genuine.

We find nothing in this record to show that defendant's officers knew anything or saw anything to arouse their suspicions as to Whitney or to cause them

to make further inquiry in regard to him. If they had followed him to his office and had seen his surroundings there, they might have learned enough to put them on further inquiry; but it can scarcely be expected that bank officers shall act as spies upon their customers. Brown knew the office surroundings, but he was thrown completely off his guard by the statement of Whitney that furniture had been ordered from Chicago, and, besides that, Brown did not communicate to the bank the condition of the office. Brown's trip to Nevada shows conclusively how completely he was deceived. Whitney was beyond question an old offender. His plan of operations was well contrived and admirably executed and calculated to throw the best business men off their guard. The chances of being defrauded by a forgery are slight. Yet bankers are in the habit of requiring identification, and indeed, they must, at their peril, require the identification of those dealing with them. But, when a person is identified by a responsible party, this requirement is fulfilled. Our conclusion is that the defendant became the *bona fide* owner of the forged draft, for value in the ordinary and usual course of business.

Let us next inquire whether it was the *holder of this draft at the time it was paid* by plaintiff on December 26, 1885. If the principle of law we have announced above, that an indorsement of a draft "for collection" does not transfer the ownership or proceeds thereof, be correct, this branch of the case will require but little discussion. This draft was indorsed by defendant "for collection," and, when the Metropolitan National Bank presented it to plaintiff for payment, it presented it as the agent of defendant, and plaintiff was bound to know this by the very form of the indorsement itself. The plaintiff knew, when it paid the draft, that the proceeds were to go to defendant. Hence it cannot now say that it thought the defendant had negotiated the draft, parted with the title to it with the

intent to give it currency as negotiable paper. Defend-
ant's indorsement destroyed the negotiability of the
draft. *Bank v. Company, supra.*

The form of the defendant's indorsement distin-
guishes this case from a number of cases, of which *Bank
v. Bank*, 106 Mass. 444, is a type, where third persons
take drafts and give them currency by indorsing them
in blank. Defendant by its indorsement in this case
warned plaintiff that it was not intended to transfer
the ownership of the draft or its proceeds, and hence the
defendant did not guarantee the genuineness of the
signature of the drawer, but it did guarantee that
the payee's signature was genuine ; and it was genuine.
It is true the payee's real name was not Whitney, but
the payee of the draft was in fact the person who went
by the name of Whitney, and this person did in fact
indorse the note ; *i. e.*, this draft was not payable to
*one person* and indorsed by *another*, but was payable
to and indorsed by the *same* person. If, therefore,
plaintiff paid the draft more readily and with less
investigation and inquiry, because a reputable bank
presented it for payment, than it would have otherwise
done, it will, nevertheless, have to bear the loss.

The defendant owed plaintiff no duty. It simply
presented for payment a draft purporting to be drawn
by the Omaha bank, and it was the duty of plaintiff to
know, before paying it, that it was in fact made by the
party who appeared to be the drawer, and having failed
to perform this duty, it cannot be heard to complain.
Here are two innocent parties upon one of which this
loss must fall. The argument that defendant's conduct
in taking the draft was not induced or controlled or
affected by plaintiff should have no influence in the
determination of questions growing out of commercial
transactions of the character involved in this contro-
versy. The business of the world is transacted now
almost wholly through banks and banking institutions
by checks, drafts and bills of exchange. This system

could not last a day unless there be fixed and determinate rules by which business men can certainly know their liability or non-liability.  It is true, if plaintiff had refused to pay this draft when presented, the loss would have fallen and *certainly* fallen on defendant, for Whitney was gone before the draft was paid in Chicago, though defendant knew it not.  But we cannot lay down rules to meet exceptional cases.  Many cases may arise in which a remedy would exist against the wrongdoer, if applied promptly.  When the defendant sent this draft to Chicago and it was paid, it had as much right to assume that its liability to loss had ceased, as if it had indorsed it in blank and it was not protested in the proper time for non-payment.  Any other rule would put the commercial world at sea.  We need not inquire now whether the rule we lay down be the best or not; we find it to exist and that it has existed since 1762.  It may, like all general rules, work occasional hardships, but considerations of convenience and public policy imperatively demand that it be not changed to do what the judge may deem equitable in a given case.  The best interests of the commercial world require stability and fixedness in commercial law.

We think it clear that plaintiff upon the pleadings and evidence in this case is not entitled to recover, and the judgment of the circuit court is accordingly affirmed. All concur.