Argued March 1, affirmed April 19, 1921.

## FIRST NAT. BANK *v.* UNITED STATES NAT. BANK.

(197 Pac. 547.)

**Banks and Banking—Bank can Recover Payment on Forged Check Where Holder is Negligent or Chargeable With Bad Faith.**

1. Under Sections 7854, 7977, 7980, Or. L., a drawee bank paying a check bears the risk of the drawer's signature being a forgery; but, if the drawee is innocent of actual fault and the holder is chargeable with bad faith or negligence, the drawee's hands are untied, and it can compel the holder to refund.

**Banks and Banking—Bank Presenting a Check not Negligent in not Detecting Forgery of Drawer's Signature, Though Having Genuine Signature of Drawer Among Its Files.**

2. Where the bank presenting a forged check had an account of the apparent drawer of the check, so that it had among its files the genuine signature of the drawer, it was not, because of such fact, as a matter of law, negligent in failing to detect the forgery of the drawer's signature.

**Bills and Notes—Presenting Checks for Payment not Representation That Drawer's Signature is Genuine—"Holder."**

3. Under Sections 7822, 7843, 7844, 7857, 7982 Or. L., the act of the holder of checks in presenting them to the drawee bank for

---

1. Right of bank to recover money paid on forged instrument by mistake, see notes in 1 Ann. Cas. 632; Ann. Cas. 1912D, 495.

Right of drawee of forged check or draft to recover money paid thereon, see note in 12 A. L. R. 1089.

payment is neither a representation nor a warranty by the holder to the drawee that the drawer's signature is genuine; such drawee bank not being a subsequent "holder" of the checks, within the meaning of term as used in the negotiable instruments law.

**Banks and Banking—Bills and Notes—Indorsement by Holder of Forged Check Presenting It to Drawee Bank for Payment not Representation of Genuineness of Drawer's Signature Under Common-law Rules or Clearing-house Rule.**

4.  Indorsements · placed by the holder of forged checks upon the back of the checks, on presenting them to the drawee bank for payment, did not constitute representations or warranties of the genuineness of the drawer's signature, either under common-law rules or a clearing-house rule attaching to the indorsement of the holder a guaranty of previous indorsements; such rule not including signatures of drawers.

**Banks and Banking—Bank can Recover Payment Made on Forged Indorsement.**

5.  The holder of a check on which he has received payment from the drawee bank must refund such payment to the bank, where he has. received such payment on a forged indorsement of the check, if the check bore the genuine signature of the drawer; such recovery being permissible both under common-law rules and under a clearing-house rule attaching to the indorsement of the holder a guaranty of previous indorsements.

**Banks and Banking—Bank cannot Recover Payment Made on Forged Check Merely Because Indorsement was also Forged.**

6.  Where a bank drawee paid a check on which not only the drawer's signature, but also the indorsement, was forged, it could not recover the amount paid from the holder of the check presenting it under the rule permitting a drawee to recover payment made on a forged indorsement; the instrument being an invalid order in its entirety, and the forged indorsement not being the proximate cause of the payment.

From Multnomah: ROBERT TUCKER, Judge.

Department 1.

This is an action brought by the First National Bank of Portland against the United States National Bank of Portland for the recovery of $532.80 paid on 18 forged checks drawn upon the First National Bank of Portland. The cause was tried, with the consent of the parties, by the court without the intervention

4.  Unrestricted indorsement of forged check as warranty of genuineness, see note in 7 **Ann. Cas.** 746.

5.  Liability of person receiving payment of check under forged indorsement, see note in 94 **Am. St. Rep.** 641.

of a jury. There was a judgment for the defendant and the plaintiff appealed.

The two banks are, as their names imply, national banking corporations and are engaged in doing a general banking business in Portland. Each bank is a member of an association known as the Portland Clearing-house. The object of this association is said to be the effecting, at one place, of the daily exchanges between the several associated banks and bankers, and the settlement of the balances resulting from such exchanges.

The Willamette Iron & Steel Works, hereinafter called the Steel Works, is a corporation doing business in Portland. The Steel Works pays its employees by delivering to them every Saturday pay-checks. The Steel Works had funds on deposit with the First National Bank, and it also had moneys on deposit with the United States National Bank. However, all the pay-checks issued by the Steel Works and delivered to its employees were drawn on the First National Bank. The Steel Works used a printed form of pay-check which was designed for its own exclusive use. All checks drawn by the Steel Works were required to be signed by B. C. Ball, its president, and by M. H. Insley, its secretary-treasurer. For convenience the signature of Ball was lithographed upon the pay-checks used by the Steel Works, but Insley was required to write his signature upon each check. The First National Bank had in its files the genuine signatures of Ball and Insley; and the United States National Bank likewise had their genuine signatures in its files.

The Steel Works caused a supply of pay-checks to be printed with the lithographed signature of Ball on them. According to the testimony of M. H. Insley,

a person going under the name of W. M. Rose learned "that these checks were going through" and "got a job at the printer's," and told a person who went under the name of Martin Shea "that these checks were going through." Insley says that *"they"* (Rose and Shea) conceived the idea of Shea "going down to our plant and getting a job" in order to obtain a pay-check and thus "procure the signature of the officer whose name was not printed on the check." The plan was carried out and Shea got a job at the Steel Works; he worked one day only, and for that day's work received a pay-check having on it the lithographed signature of Ball and the written signature of Insley. Rose stole some of the blank checks from the printer. Using the pay-check received by Shea from the Steel Works as a sample of Insley's genuine signature, the persons, whom we shall call Rose and Shea, forged the name of M. H. Insley as secretary-treasurer of the Steel Works to each of these stolen blank checks. Some of these forged checks passed through other banks before reaching the First National Bank as drawee; eighteen of the forged checks passed through the United States National Bank; and none but these eighteen checks are involved in this action. Each check was dated December 21, 1918, and purported to be drawn for the sum of $29.60, and appeared upon its face to be regular. The forged signature of Insley was a good imitation of his genuine signature. Some checks were made payable to the order of W. M. Rose, but a majority of them were made payable to the order of Martin Shea. On the back of each of the checks made payable to the order of W. M. Rose the following indorsement appears: "W. M. Rose, 246½ Yamhill"; and on the back of the Martin Shea checks the fol-

lowing was written: "Martin Shea, 49½ Ninth N."
These eighteen checks were negotiated to as many
different merchants in Portland. Each of these
eighteen merchants was a client and a depositor of
the United States National Bank. Each of the
eighteen merchants took his check to the United
States National Bank, and after indorsing his name
on the back of the check delivered it to the United
States National Bank and received credit for the
amount of the face of the check. These eighteen
checks were received by the United States National
Bank on and between December 24 and 28, 1918.

The United States National Bank stamped on the
back of each of the eighteen checks an impression of
its clearing-house stamp and then on and between
December 24th and 28th, presented them through the
Portland Clearing-house to the First National Bank
for payment; and the First National Bank paid to
the United States National Bank the amount of the
eighteen checks, aggregating $532.80, and at the same
time the First National Bank charged this amount
against the account of the Steel Works. The defend-
ant's clearing-house stamp contained its name, the
number of its membership in the association, the date,
and the following words: "Pay through Clearing-
house."

On January 2, 1919, the Steel Works received from
the First National Bank a bank statement together
with the eighteen checks "as returned vouchers."
On or about January 13, 1919, the Steel Works dis-
covered that the checks had been forged, and the
Steel Works immediately returned them to the First
National Bank with the information that all the pur-
ported signatures of Insley were forgeries. The
First National Bank credited the Steel Works with
the amount of the face of the forged checks and then

took them to the United States National Bank, "claiming that one of the maker's signatures thereto was a forgery, and also claiming that the signatures of the payees were forgeries"; and at the same time the First National Bank "requested defendant to collect for and pay over to plaintiff the amount of said several checks from said merchants who had indorsed said checks and deposited them with defendant."

The United States National Bank admits that it notified the merchants of the request made by the plaintiff. However, the defendant explains that the plaintiff had asserted a right to a return of the moneys paid to the defendant on the forged checks, and that because of the claim asserted by the plaintiff and in order to protect itself the defendant notified the merchants of the claim which had been made by the First National Bank and the United States National Bank also says that it requested the merchants to take steps to protect it. Thirteen of the eighteen merchants delivered to the United States National Bank the amounts of their checks, aggregating $384.80. Apparently five of the eighteen merchants did nothing. According to the answer,—

"certain of said merchants, depositors with the defendant, did, in order to, and solely for the purpose of, protecting the defendant, place in the hands of the defendant the amounts represented by said checks, which amounts defendant is holding solely and only for the purpose of protecting the defendant in the event it should be determined that the demands and claims of plaintiff are rightful but as the moneys of said merchants deposited for said purposes only."

One of the rules of the clearing-house requires each member of the association to have a clearing-house stamp; and this rule further declares that—

"The clearing-house stamp used by the members in clearing items through the clearing-house should be understood to guarantee previous indorsements on all items cleared except certificates of deposit."

Another rule, Article XVI, Section 2, provides:

"All negotiable paper deposited for clearance by the members of this association shall bear the stamp of the depositing bank, which shall clearly indicate the name of the bank, its clearing-house number and the date of clearance. The stamp shall be for clearing-house purposes only, and shall guarantee the validity and regularity of all prior indorsements on the paper so cleared, except the indorsement of an original payee of a certificate of deposit, and it shall not be construed to supply a missing indorsement."

The last two mentioned rules are relied upon by the plaintiff.

The defendant relies upon the rule known as Article XIV, Section 2, which reads as follows:

"Errors in the exchanges and claims arising from the return of checks, or from any other cause, are not to be adjusted through the clearing-house, but directly between the members who are the parties to them; all checks and drafts in the exchanges not found good, or missent, shall be returned without intentional mutilation, or notice of dishonor, given directly to the members from whom they were received, not later than 3:30 o'clock P. M. of the day in which said returned vouchers were exchanged, except Saturday, when the hour shall be 12:30 o'clock P. M., and the said member shall immediately refund to the bank returning the same the amount for which it had received credit through the clearing-house for the said checks or drafts so returned to it; in case of the refusal or inability of any member to promptly refund to the bank presenting such checks or drafts so returned, the bank holding them may report to the manager of the clearing-house the amount of the same, and it shall be the manager's duty, with the

approval of the clearing-house committee, to take from the settling sheet of both members the amount of such checks, drafts or other items so reported, and to readjust the clearing-house statement and declare the correct balances in conformity with the changes so made; provided, that such report of default shall be given to the manager before the hour set for payment by him of the credit balances resulting from that day's exchanges."

W. M. Rose was not the true name of the person who stole the checks from the printer, nor was Martin Shea the true name of the person who worked at the shop of the Steel Works; but these names "were fictitious names used by" them for the purpose of accomplishing the forgery and utterance of the checks. The trial court found as a fact that—

"The payees named in each of said checks were fictitious payees, and the indorsements of the name of the payees appearing upon the back of each of said checks were fictitious indorsements, and such fact was known to the person making them so payable."

AFFIRMED.

For appellant there was a brief over the names of *Messrs. Dolph, Mallory, Simon & Gearin* and *Mr. Edgar Freed,* with an oral argument by *Mr. Joseph Simon.*

For respondent there was a brief over the names of *Mr. Hugh Montgomery* and *Messrs. Platt & Platt,* with an oral argument by *Mr. Montgomery.*

HARRIS, J.—The plaintiff argues that it is entitled to recover because: (1) The defendant is chargeable with negligence in not having detected the forgery of Insley's signature; and (2) even though

the defendant was not negligent, the indorsement of the checks and presentment for payment, followed by actual payment, oblige the defendant to refund. The questions arising out of the charge of negligence will be first considered; and afterward attention will be given to the numerous questions arising out of the indorsement, presentment for payment and receipt of payment by the defendant.

1. Where a holder for value in due course presents to the drawee a bill of exchange to which the name of the drawer has been forged, and the drawee pays the instrument, the holder and drawee being alike ignorant that the signature of the ostensible drawer was forged, and it is subsequently discovered that the signature of the drawer was forged, the drawee cannot recover the payment made to the holder. If in similar circumstances a drawee accepts a bill of exchange and then permits it to go into circulation, he cannot avoid his obligation to pay even though the forgery is discovered after the acceptance and before presentment for payment. Such was the rule announced in England in 1762 by Lord MANSFIELD in *Price* v. *Neal,* 3 Burr. 1354; and it was repeatedly recognized and accepted as a part of the law-merchant of England, 4 Har. Law Rev. 297.

Although in this country most of the text-writers and some judges have protested strongly against the rule announced in *Price* v. *Neal,* the doctrine established by that case has been accepted as a part of our law-merchant by the national supreme court as well as by most of the state appellate tribunals: *Bank of United States* v. *Bank of State of Georgia,* 10 Wheat. 333 (6 L. Ed. 334, see, also, Rose's U. S. Notes); *State Bank* v. *Cumberland Savings & Trust Co.,* 168 N. C. 605 (85 S. E. 5, L. R. A. 1915D, 1138); *Deposit*

*Bank of Georgetown* v. *Fayette Nat. Bank,* 90 Ky. 10
(13 S. W. 339, 7 L. R. A. 849); *Northwestern Nat.
Bank of Chicago* v. *Bank of Commerce of Kansas
City,* 107 Mo. 402 (17 S. W. 982, 15 L. R. A. 102);
*First Nat. Bank of Belmont* v. *First Nat. Bank of
Barnesville,* 58 Ohio St. 207 (50 N. E. 723, 65 Am. St.
Rep. 748, 41 L. R. A. 584); *Germania Bank* v. *Boutell,*
60 Minn. 189 (62 N. W. 327, 51 Am. St. Rep. 519, 27
L. R. A. 635); *National Park Bank* v. *New York
Ninth National Bank,* 46 N. Y. 77 (7 Am. Rep. 310);
*Bank of Williamson* v. *McDowell County Bank,* 66
W. Va. 545 (66 S. E. 761, 36 L. R. A. (N. S.) 605);
2 Michie on Banks and Banking, 1496.

Stated broadly and in general language, the drawee
named in a bill of exchange is bound to know the
signature of the drawer and hence accepts or pays the
instrument at his peril. A check is defined as "a bill
of exchange drawn on a bank payable on demand":
Section 7977, Or. L. A bank is bound to know the
signatures of its depositors, and, therefore, if as
drawee a bank pays a check to which is signed the
name of one of its depositors, it does so at its peril.
There are a few jurisdictions in which it is held that
the drawee can recover even from an innocent holder
if the holder will, after recovery, be in no worse con-
dition than if the bank had refused to pay the bill
of exchange or check: *Bank of Lisbon* v. *Bank of
Wyndmere,* 15 N. D. 299 (108 N. W. 546, 125 Am. St.
Rep. 588, 10 L. R. A. (N. S.) 49); *American Express
Co.* v. *State National Bank,* 27 Okl. 824 (113 Pac. 711,
33 L. R. A. (N. S.) 188). Although in most of the
American jurisdictions the courts are agreed upon the
general rule that the drawee named in a bill of ex-
change or check is bound to know the signature of
the drawer, and therefore by paying assumes the loss

that results from the name of the drawer being a forgery, if it subsequently appears to be a forgery, yet these same courts are not agreed upon the reasons for the rule. In practically all of the adjudications which follow the doctrine of *Price* v. *Neal* it is conceded that the doctrine furnishes an exception to the rule which permits the recovery of money paid under a mistake of fact: *Bank of Williamson* v. *McDowell County Bank*, 66 W. Va. 545 (66 S. E. 761, 36 L. R. A. (N. S.) 605); *People's Bank* v. *Franklin Bank*, 88 Tenn. 299 (12 S. W. 716, 17 Am. St. Rep. 884, 6 L. R. A. 724); *Germania Bank* v. *Boutell*, 60 Minn. 189 (62 N. W. 327, 51 Am. St. Rep. 519, 27 L. R. A. 635). Some judges rest the rule upon grounds of estoppel; others say that it is governed by the principles of negligence; and still others invoke the principle of natural justice, that as between two persons one of whom must suffer, the legal title shall prevail. Frequently the suggestion is made that the rule arises out of considerations of convenience as well as of commercial necessity; for, it is said, throughout the entire business world bills of exchange and checks in large part serve as currency in each day's business transactions, and it is not only convenient but necessary that there shall be a definite time and a fixed place for final settlement and that the best time and most appropriate place for such final settlement is the time and place when and where an instrument is presented to the drawee for payment: Note in *First Nat. Bank of Lisbon* v. *Bank of Wyndmere* (N. D.), 10 L. R. A. (N. S.) 49; 4 Har. Law Rev. 297; *Bank of Williamson* v. *McDowell County Bank*, 66 W. Va. 545 (66 S. E. 761, 36 L. R. A. (N. S.) 605); *Farmers' Nat. Bank* v. *Farmers' Trust Bank*, 159 Ky. 141 (166 S. W. 986, L. R. A. 1915A, 77, 88); *First Nat. Bank*

of *Marshalltown* v. *Marshalltown State Bank,* 107 Iowa, 327 (77 N. W. 1045, 44 L. R. A. 131); *Dedham Nat. Bank* v. *Everett Nat. Bank,* 177 Mass. 392 (59 N. E. 62, 83 Am. St. Rep. 286); *Germania Bank* v. *Boutell,* 60 Minn. 189 (62 N. W. 327, 51 Am. St. Rep. 519, 27 L. R. A. 635). At present we are chiefly interested in ascertaining the rule of the law-merchant rather than the reasons for the rule; and, having ascertained that the doctrine of *Price* v. *Neal* has prevailed in most of the American jurisdictions as a part of the law-merchant, we need not attempt to inquire further into the reasons for the rule.

The general statement that a drawee who pays a bill of exchange or check does so at his peril, is not strictly accurate, for it is subject to qualification and exception. The general language employed in this statement fails to take into account any of the duties resting upon the holder. The doctrine of *Price* v. *Neal* is not available to a holder who (1) is guilty of bad faith, or (2) has been negligent. The rule with which we are now concerned is more accurately stated when we say that a drawee who has paid a bill of exchange or check cannot recover the payment from a holder in good faith for value and without fault. The holder is guilty of bad faith towards the drawee and must refund if he participated in the forgery, or if he knew the check was forged, or knew of circumstances causing suspicion of its genuineness and these circumstances were neither known to the drawee nor communicated to him by the holder. Obviously, a bad faith holder ought not to be permitted to retain money received from an innocent drawee on a bill of exchange or check to which the name of the drawer has been forged; and so say all the authorities. But if we suppose that an indorser was a holder

in good faith, can he retain money paid to him by an innocent drawee even though he has been negligent? The adjudications are practically unanimous in their answers to this question. There are four precedents which, together with a dissenting opinion in a fifth precedent and possibly one or two additional decisions, must be deemed as standing apart from the rest of reported judicial opinions: *Commercial & F. Nat. Bank* v. *First Nat. Bank,* 30 Md. 11 (96 Am. Dec. 554); *Bank of St. Albans* v. *Farmers' & M. Bank,* 10 Vt. 141 (33 Am. Dec. 188); *Salt Springs Bank* v. *Syracuse Sav. Inst.,* 62 Barb. (N. Y.) 101; *Howard* v. *Mississippi Valley Bank,* 28 La. 727 (26 Am. Rep. 105). To the extent that these four cases may be regarded as authority for relieving a bank from its own misconduct in negligently purchasing a check drawn upon another bank, they are out of harmony with practically all else that has been written upon the subject: *Bank of Williamson* v. *McDowell County Bank,* 66 W. Va. 545 (66 S. E. 761, 36 L. R. A. (N. S.) 605, 609); 4 Har. Law Rev. 297, 301.

A holder cannot profit by a mistake which his negligent disregard of duty has contributed to induce the drawee to commit: *Ellis* v. *Ohio Life Ins. & Trust Co.,* 4 Ohio St. 628, 668 (64 Am. Dec. 610). The holder must refund, if by his negligence he has contributed to the consummation of the mistake on the part of the drawee by misleading him: *Germania Bank* v. *Boutell,* 60 Minn. 189, 194 (62 N. W. 327, 51 Am. St. Rep. 519, 27 L. R. A. 635). If the only fault attributable to the drawee is the constructive fault which the law raises from the bald fact that he has failed to detect the forgery, and if he is not chargeable with actual fault in addition to such constructive fault, then he is not precluded from recovery from a

holder whose conduct has been such as to mislead the drawee or induce him to pay the check or bill of exchange without the usual security against fraud. The holder must refund to a drawee who is not guilty of actual fault if the holder was negligent in not making due inquiry concerning the validity of the check before he took it, and if the drawee can be said to have been excused from making inquiry before taking the check because of having had a right to presume that the holder had made such inquiry: *Germania Bank* v. *Boutell,* 60 Minn. 189, 194 (62 N. W. 327, 51 Am. St. Rep. 519, 27 L. R. A. 635); *Bank of Williamson* v. *McDowell County Bank,* 66 W. Va. 545 (66 S. E. 761, 36 L. R. A. (N. S.) 605); *Deposit Bank of Georgetown* v. *Fayette Nat. Bank,* 90 Ky. 10 (13 S. W. 339, 7 L. R. A. 849); *People's Bank* v. *Franklin Bank,* 88 Tenn. 299 (12 S. W. 716, 17 Am. St. Rep. 884, 6 L. R. A. 724; *First Nat. Bank of Danvers* v. *First Nat. Bank of Salem,* 151 Mass. 280 (24 N. E. 44, 21 Am. St. Rep. 540); *Dedham Nat. Bank* v. *Everett Nat. Bank,* 177 Mass. 392 (59 N. E. 62, 83 Am. St. Rep. 286); *National Bank of North America* v. *Bangs,* 106 Mass. 441 (8 Am. Rep. 349); *First Nat. Bank of Marshalltown* v. *Marshalltown State Bank,* 107 Iowa, 327 (77 N. W. 1045, 44 L. R. A. 131). See, also, *Neal* v. *Coburn,* 92 Me. 139, 150 (42 Atl. 348, 69 Am. St. Rep. 495).

Apt illustrations of culpable negligence of a holder are found in that class of cases where a stranger representing himself to be the payee presents to a bank a check drawn upon another bank and the first bank purchases the check without inquiry and without identification of the person presenting the check. The customary practice of banks is to require identification of strangers, and for that reason the drawee

bank has a right to assume that the purchasing bank has in accordance with such customary practice of banks made inquiry and required identification; and, therefore the failure of the purchasing bank to observe such customary practice has in many instances made the purchasing bank liable to the drawee bank for payments made on checks to which the name of the drawer has been forged: *People's Bank* v. *Franklin Bank,* 88 Tenn. 299 (12 S. W. 716, 17 Am. St. Rep. 884, 6 L. R. A. 724); *First Nat. Bank* v. *State Bank,* 22 Neb. 769 (36 N. W. 289, 3 Am. St. Rep. 294); *First Nat. Bank of Danvers* v. *First Nat. Bank of Salem,* 151 Mass. 280 (24 N. E. 44, 21 Am. St. Rep. 450); *National Bank of North America* v. *Bangs,* 106 Mass. 441 (8 Am. Rep. 349); *Farmers' Nat. Bank* v. *Farmers & Traders' Bank,* 159 Ky. 141 (166 S. W. 986, L. R. A. 1915A, 77); *Woods* v. *Colony Bank,* 114 Ga. 683 (40 S. E. 720, 56 L. R. A. 929). See, also, *Woodward* v. *Savings & Trust Co.,* 178 N. C. 184 (100 S. E. 304, 5 A. L. R. 1561); *Canadian Bank of Commerce* v. *Bingham,* 30 Wash. 484 (71 Pac. 43, 60 L. R. A. 955). However, see *Pennington Bank* v. *Moorhead First State Bank,* 110 Minn. 263 (125 N. W. 119, 136 Am. St. Rep. 496, 26 L. R. A. (N. S.) 849).

If the instant case were to be governed by rules of the law-merchant, the defendant could invoke the doctrine of *Price* v. *Neal,* and the plaintiff could, if the defendant was negligent, counter by advancing the contention that the negligence of the defendant deprives it of the protection which would otherwise be afforded by the rule which binds the drawee to know the signature of the drawer of the check: *First Nat. Bank* v. *Bank of Cottage Grove,* 59 Or. 388, 394 (117 Pac. 293).

The doctrine of *Price* v. *Neal* has been carried into the uniform negotiable instruments law. The following sections of the negotiable instruments law are important:

Section 7854, Or. L.: "The acceptor, by accepting the instrument, engages that he will pay it according to the tenor of his acceptance; and admits (1) the existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the instrument; and (2) the existence of the payee and his then capacity to indorse."

Section 7977, Or. L.: "A check is a bill of exchange drawn on a bank payable on demand. Except as herein otherwise provided, the provisions of this act applicable to a bill of exchange payable on demand apply to a check."

Section 7980, Or. L.: "Where the holder of a check procures it to be accepted or certified, the drawer and all indorsers are discharged from liability thereon."

Sections 7854, 7977 and 7980, Or. L., correspond respectively with Sections 62, 185 and 188 of the negotiable instruments law.

It will be observed that in Section 7854, Or. L., the word "accepting" and not the word "paying" is employed in the statute; and yet in all the states where the question has been presented, except the state of Pennsylvania, where a different course of legislation has produced a different result and except in South Dakota (Crawford's Ann. Neg. Inst. Law (4 ed.), 121; Brannan's Neg. Inst. Law (3 ed.), 229, 231), the courts have ruled that Section 62 is merely a legislative affirmation of the rule announced in *Price* v. *Neal,* and that this section includes the payment as well as the acceptance of a negotiable instrument on the theory that the section was intended as a legislative adoption of the entire doctrine of

*Price* v. *Neal.* This is the view expressed by this
court in *First Nat. Bank* v. *Bank of Cottage Grove,*
59 Or. 388, 396 (117 Pac. 293), now a leading author-
ity upon this point; and the conclusion reached by
this court is concurred in by other courts and text-
writers: *National Bank of Rolla* v. *First Nat. Bank
of Salem,* 141 Mo. App. 719 (125 S. W. 513); *National
Bank of Commerce* v. *Mechanic's American National
Bank,* 148 Mo. App. 1 (127 S. W. 429); *State Nat.
Bank* v. *Bank of Magdalena,* 21 N. M. 653 (157 Pac.
498, L. R. A. 1916E, 1296); *Cherokee Nat. Bank* v.
*Union Trust Co.,* 33 Okl. 342 (125 Pac. 464); *Figuers*
v. *Fly,* 137 Tenn. 358 (193 S. W. 117). See, also,
*Title Guarantee & Trust Co.* v. *Haven,* 126 App. Div.
802 (111 N. Y. Supp. 305); *Bergstrom* v. *Ritz-Carleton
Restaurant & Hotel Co.,* 171 App. Div. 776 (157 N. Y.
Supp. 959); *Title Guarantee & Trust Co.* v. *Haven,*
196 N. Y. 487 (89 N. E. 1082, 17 Ann. Cas. 1131, 25
L. R. A. (N. S.) 1308); *Farmers & Merchants' Bank*
v. *Bank of Rutherford,* 115 Tenn. 64 (88 S. W. 939,
112 Am. St. Rep. 817); Brannan's Neg. Inst. Law
(3 ed.), 229; 5 R. C. L. 552; 8 C. J. 608.

Thus it appears that Section 62 of the negotiable
instruments law has, except in Pennsylvania and ex-
cept in South Dakota, been received as a legislative
affirmation of the rule in *Price* v. *Neal:* Brannan's
Neg. Inst. Law (3 ed.), 231. It will be observed
that Section 62 does not in terms provide for the ex-
ceptions, such as negligence of the holder, which had
been recognized in nearly every reported judicial de-
cision where the doctrine of *Price* v. *Neal* had been
followed. In other words, notwithstanding state-
ments occasionally made to the effect that there is a
conflict among the authorities, a careful examination
of the precedents will disclose that, aside from the

four cases previously mentioned, and possibly a few
more, the courts which had followed *Price* v. *Neal*
had also recognized negligence on the part of the
holder as an exception which prevented the rule from
operating against the drawee.  Instead of saying that
the negligence of the holder creates an exception to
the rule in *Price* v. *Neal*, it is perhaps a more accu-
rate statement of the rule itself to say that, if there
is freedom from both negligence and bad faith on the
part of the holder, the drawee cannot recover pay-
ment made on a forged check, but, if the holder is
chargeable with negligence or bad faith the rule does
not apply against an innocent drawee: *Canadian
Bank of Commerce* v. *Bingham,* 30 Wash. 484 (71
Pac. 43, 60 L. R. A. 955; *Bank of Williamson* v. *Mc-
Dowell County Bank,* 66 W. Va. 545 (66 S. E. 761, 31
L. R. A. (N. S.) 605, 608).

The negotiable instruments law is in the main a
codification of the rules of the law-merchant; and in
most instances where there had been a difference of
judicial opinion the negotiable instruments law will
upon investigation be found to have adopted the
rule of the majority.  With but few reported deci-
sions to the contrary, the courts of this country which
had followed *Price* v. *Neal* had for a century, recog-
nized negligence upon the part of the holder as an ex-
ception which untied the hands of the drawee and en-
abled him to recover from the negligent holder; and
in this situation it is inconceivable that the framers
of the act designed to make Section 62 absolute and
free from the exceptions which had been previously
recognized.  Section 62 has been criticised because it
fails to speak of the exceptions which had come to be
so generally observed (59 Univ. of Pa. Law Rev.
493); and yet the history of the *Price* v. *Neal* rule

and the condition of the judicial decisions in this country when the negotiable instruments law was framed make it obvious that the legislatures adopted the *Price* v. *Neal* rule with its exceptions, although the exceptions were not expressed, just as the courts had adopted the rule with its exceptions. This court and other courts have held that the rule of *Price* v. *Neal* in its present form as a legislative rule is subject to the exceptions which prevailed when it existed in its form as a judicial rule: *First Nat. Bank* v. *Bank of Cottage Grove,* 59 Or. 388 (117 Pac. 293); Brannan's Neg. Inst. Law (3 ed.), 229.

2. Having determined that Section 7854, Or. L., is not available to the United States National Bank if it was negligent, the next inquiry is: Was the defendant negligent? The United States National Bank cannot be charged with negligence unless it was remiss in some duty; nor, even though the defendant was negligent, can the plaintiff derive any benefit from such negligence unless the negligence contributed to the consummation of the mistake made by the plaintiff. There is nothing in the record to indicate that any of the eighteen merchants failed to require identification of the persons who went under the names of Rose and Shea; and, even though it be assumed that the eighteen merchants were negligent, their negligence cannot be imputed to the United States National Bank, for the merchants negotiated the checks to the United States National Bank and it received the checks with the names of the payees and the merchants indorsed upon the backs of the checks: *First National Bank of Marshalltown* v. *Marshalltown State Bank,* 107 Iowa, 327, 330 (77 N. W. 1045, 44 L. R. A. 131). However, there is nothing in the record to indicate that the merchants were negligent

in any respect when they took the checks from the persons who were going under the names of Rose and Shea. Every one of the eighteen checks came to the defendant from regular depositors who were presumably reputable, and in the regular course of business. There was nothing upon the face of any of the checks to excite suspicion; and it is not claimed that any of the eighteen merchants knew or had any reason to suspect that the checks were forgeries. It cannot be said that there was so much as a single circumstance in connection with the presentation of the checks to create the slightest ground for suspicion; and, consequently, if the defendant was guilty of negligence at all it was because, having the genuine signature of Insley in its files, and hence the means by which to detect forgeries, it failed to make a comparison of the signatures. The uncontradicted testimony of the vice-president of the First National Bank is that the forged signature of Insley appearing on the checks is "a very good imitation."

If the United States National Bank had been aware of the forgeries, or if it had known of circumstances sufficient to put it upon inquiry, a duty in respect of the signature of the drawer would have been imposed upon it; but in the absence of such knowledge or circumstances the United States National Bank owed no duty to the First National Bank to inquire about the genuineness of the signature of the drawer, for the drawee must know the signature of the drawer: *Germania Bank* v. *Boutell,* 60 Minn. 189 (62 N. W. 327, 51 Am. St. Rep. 519, 27 L. R. A. 635); *Price* v. *Neal,* 3 Burr. 1354; *Bank of Williamson* v. *McDowell County Bank,* 66 W. Va. 545 (66 S. E. 761, 37 L. R. A. (N. S.) 605); *Crocker-Woolworth Nat. Bank* v. *Nevada Bank,* 139 Cal. 564 (73 Pac. 456, 96 Am. St.

Rep. 169, 63 L. R. A. 245); *State Bank* v. *First Nat. Bank,* 87 Neb. 351 (127 N. W. 244, 29 L. R. A. (N. S.) 100). Owing no duty to the drawee in respect of the signature of the drawer, the defendant bank, which it must be remembered was the third indorser, cannot be charged with negligence for having failed to compare the signature of Insley as it appears upon the checks with the signature as it appeared in the defendant bank's files of genuine signatures. Since the defendant was under no obligation to inquire about the genuineness of the signature of the drawer, the defendant cannot be charged with negligence in not doing what it was not required to do; and the plaintiff is in no position to say that its mistake was due wholly or even in part to the failure of the defendant to investigate the signature of Insley. If it can be said that it was the duty of the defendant as a matter of law to compare the signature on the checks with the signature in its files, it could likewise be said that if the purported drawer was within easy reach of the defendant it should have inquired of the drawer concerning the checks; but it is not the law that the holder must go out and seek the drawer. The fact that the defendant had in its files the genuine signature of a drawer might, if there were other circumstances tending to show negligence, be considered in determining whether the defendant was negligent; but it cannot be said that the failure to compare the signatures was as a matter of law negligence on the part of the defendant. Moreover, the uncontradicted evidence is that it is customary among banks in Portland when checks are received from their depositors for presentation to drawee banks "to examine the indorsement, and not the signatures on the face of the check; the amount, and the indorsement of the payee

and not the signatures on the face of the check; because there are several of the firms in the city that have accounts in several different banks, and no attempt is made to examine signatures on the face of the check for genuineness." It is the duty of the drawee to know the signature of the drawer. As between the drawee and a holder, it is the duty of the holder to know the signature of prior indorsers. It has been held that even if a drawer draws a check payable to his own order and at once indorses it, a payment of it by the drawee admits only the genuineness of the drawer's original signature, but not the genuineness of his indorsement: *First Nat. Bank of Chicago* v. *Northwestern Nat. Bank,* 152 Ill. 276, 307 (38 N. E. 739, 43 Am. St. Rep. 247, 26 L. R. A. 289); *Missouri Lincoln Trust Co.* v. *Third Nat. Bank,* 154 Mo. App. 89 (133 S. W. 357). The fact that the indorser in this instance is a depositor of the drawee does not shift to the drawee the duty of the holder to know the signature of the indorser. In the instant case it was not the duty of the defendant to know Insley's signature unless the signature appeared on the check as an indorser. The fact that the drawer was a depositor of the holder does not shift to the holder the duty of the drawee to know the signature of the drawer.

We cannot say that the defendant was negligent as a matter of law. Nor can we say in this appeal that the defendant was negligent as a matter of fact; because it devolved upon the plaintiff to show negligence, and the findings of the trial court were against the plaintiff: *Deposit Bank of Georgetown* v. *Fayette Nat. Bank,* 90 Ky. 10 (13 S. W. 339, 7 L. R. A. 849).

The plaintiff cannot derive any benefit from the fact that thirteen of the merchants delivered an ag-

gregate of $384.40 to the defendant, because this money is not held by the defendant as its own money or as the money of the plaintiff; but it is held as the money of the merchants and can be paid by the defendant to the plaintiff only in the event that it is judicially held that ''the demands and claims of plaintiff are rightful.'' If the defendant's negligence contributed to the mistake made by the plaintiff, the latter being innocent of actual fault, the plaintiff can recover, regardless of whether the defendant has or has not collected the money from the merchants. If the merchants had unconditionally delivered money to the defendant to be delivered in any event to the plaintiff, a different situation would be presented.

3, 4. The act of presenting a check through the clearing-house to the plaintiff for payment was neither a representation nor a warranty that the signature of Insley was genuine. Nor did the defendant's clearing-house stamp placed upon the check as an indorsement constitute a representation or a warranty that the signature of the drawer was genuine. The question as to whether or not the defendant's indorsement with its clearing-house stamp and the presentment for payment, either singly or in combination constituted a representation or warranty that the signature was genuine presents itself in two aspects: (1) In the light of the negotiable instruments law; and (2) in the light of the law-merchant. There is no section of the negotiable instruments law declaring that an indorsement by the holder and presentment for payment shall be deemed a representation to the drawee by the holder that the signature of the drawer is genuine.

The two sections of the negotiable instruments law which prescribe the warranties imposed upon an in-

dorser are Sections 7857 and 7858, Or. L. It is said in Section 7857, Or. L., that "Every person negotiating an instrument by delivery or by a qualified indorsement warrants" certain specified things. By the terms of Section 7858, Or. L., "every indorser who indorses without qualification warrants to all subsequent holders in due course," specified matters and things. It will be observed that Section 7857, Or. L., imposes warranties only on the person "negotiating"; and it will also be observed that Section 7858 declares that a person who indorses without qualification warrants only to "subsequent holders in due course." If we turn to Section 7822, Or. L., we shall see that—

"An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof."

Section 7982, Or. L., defines "holder" as "the payee or indorsee of a bill or note who is in possession of it, or the bearer thereof."

Section 7844, defines a holder in due course to be one—

"Who has taken the instrument under the following conditions: (1) that it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Under the provisions of Section 7843, Or. L.:

"The holder of a negotiable instrument may sue thereon in his own name; and payment to him in due course discharges the instrument."

Manifestly, presentment to the drawee for payment is not a negotiation of a check; for payment transmutes the paper from a negotiable instrument into a mere canceled voucher. When paid the check has run its course as a negotiable instrument: *First Nat. Bank* v. *Bank of Cottage Grove,* 59 Or. 388, 396 (117 Pac. 293). It is manifest that the drawee, who pays a check and then receives it as a canceled voucher divested of its character as a negotiable instrument, is not "a holder" within the meaning of that term as it is used in the negotiable instruments law. It follows, therefore, that the negotiable instruments law did not write into the indorsement of the defendant any of the warranties prescribed by Sections 7857 and 7858, Or. L.: *National Bank* v. *Mechanic's American National Bank,* 148 Mo. App. 1 (127 S. W. 429); *National Bank of Commerce* v. *Farmers & Merchants' Bank,* 87 Neb. 841 (128 N. W. 522); *Figuers* v. *Fly,* 137 Tenn. 358 (193 S. W. 117); *Farmers & Merchants' Bank* v. *Bank of Rutherford,* 115 Tenn. 64 (88 S. W. 939, 112 Am. St. Rep. 817); *Aurora State Bank* v. *Bank of Rutherford,* 115 Tenn. 64 (88 S. W. 939, 112 Am. St. Rep. 817); *Aurora State Bank* v. *Hayes-Eames Elevator Co.,* 88 Neb. 187 (129 N. W. 279); Brannan's Neg. Inst. Law (3 ed.), 131. See, also, *Neal* v. *Coburn,* 92 Me. 139, 150 (42 Atl. 348, 69 Am. St. Rep. 495).

We now inquire whether the indorsement and presentment for payment operated under the rules of the law-merchant, as a warranty by the defendant holder to the plaintiff drawee that the signature of Insley was genuine. Many and probably most of the text-writers have persistently opposed the doctrine of *Price* v. *Neal* and naturally we should expect to find among such text-writers those who take the view that

an indorsement by a holder plus presentment for payment produce a warranty by the holder that the signature of the drawer is genuine. It is true also there may be found among the reported court decisions precedents to the effect that the holder warrants to the drawee the genuineness of the signature of the drawer: *People's Bank* v. *Franklin Bank,* 88 Tenn. 299, 303 (12 S. W. 716, 17 Am. St. Rep. 884, 6 L. R. A. 724); *Woods* v. *Colony Bank,* 114 Ga. 683, 686 (40 S. E. 720, 56 L. R. A. 929); *Williamsburgh Trust Co.* v. *Tum Suden,* 120 App. Div. 518 (105 N. Y. Supp. 335). See, also, *Canadian Bank of Commerce* v. *Bingham,* 30 Wash. 484 (71 Pac. 43, 60 L. R. A. 955); *Ford* v. *People's Bank,* 74 S. C. 180 (54 S. E. 204, 114 Am. St. Rep. 986, 7 Ann. Cas. 744, 10 L. R. A. (N. S.) 63).

Those who refuse to accede to the doctrine of *Price* v. *Neal* may consistently argue that the holder warrants the genuineness of the drawer's signature; but those authorities which adhere to *Price* v. *Neal* cannot with any semblance of consistency in one breath say that the drawee warrants the signature of the drawer and in the next breath say that the holder warrants the drawer's signature. To say that the rule of *Price* v. *Neal* applies except where the holder indorses the check is to except the rule out of existence, because in actual practice nearly all checks and bills of exchange are indorsed by the holder when presented for payment. It is utterly illogical to say on the one hand that by making payment the drawee warrants to the holder the genuineness of the drawer's signature and on the other hand that by receiving payment the holder warrants the same thing to the drawee. If each warrants to the other exactly the same thing, then in case of payment of a forged

check, the warranty of the holder meets and conflicts with that of the drawer, and each warranty being equal to the other, neither can prevail over the other. The better rule and the only rule which can be logically followed in jurisdictions where either by judicial decision or by statute the doctrine of *Price* v. *Neal* governs, is that the holder does not, by writing his name on the back of a check and presenting it for payment warrant to the drawee the genuineness of the signature of the drawer. Nor can it be said with any show of consistency that the act of presenting the check for payment is equivalent to a representation by the holder that the genuine signature of the drawer is attached to the check. By paying the check the drawee warrants the signature of the drawer: *Germania Bank* v. *Boutell,* 60 Minn. 189 (62 N. W. 327, 51 Am. St. Rep. 519, 27 L. R. A. 635); *State Bank* v. *First Nat. Bank,* 87 Neb. 351 (127 N. W. 244, 29 L. R. A. (N. S.) 100); *Farmers & Merchants' Bank* v. *Farmers' Bank of Rutherford,* 115 Tenn. 64 (88 S. W. 939, 112 Am. St. Rep. 817); *National Bank of Rolla* v. *First Nat. Bank of Salem,* 141 Mo. App. 719 (125 S. W. 513); *State Bank* v. *Cumberland Savings & Trust Co.,* 168 N. C. 605 (85 S. E. 5, L. R. A. 1915D, 1138); *New York P. E. Bank* v. *Twelfth Ward Bank,* 135 App. Div. 52 (119 N. Y. Supp. 988, 56 Am. Law Reg. (N. S.) 122); 4 Har. Law Rev. 297, 302; Brannan's Neg. Inst. Law (3 ed.), 230, 249.

5. Thus far we have determined that the clearing-house stamp indorsed by the defendant on the back of the checks did not create a warranty that the signature of the drawer was genuine, and that the result is the same whether the indorsement is viewed in the light of the negotiable instruments law or in the light of the rules of the law-merchant. However, payment

by the drawee does not in all circumstances free a holder from liability. The drawee does not warrant the genuineness of the signatures of the indorsers, for he is not in a position to know their signatures. The holder is bound to know that the previous indorsements, including that of the payee, are genuine; and therefore the holder of the check who accepts payment undertakes that all indorsements prior to his own are genuine. The consequence of this rule is that if a holder possesses a check having on it the genuine signature of the drawer and the forged indorsement of the payee or other indorser, and such holder receives payment from the drawee he must refund to the drawee: *Bank of Williamson* v. *McDowell County Bank*, 66 W. Va. 545 (66 S. E. 761, 36 L. R. A. (N. S.) 605); 8 C. J. 608; 5 R. C. L. 564.

When a holder signs his name on the back of a check and then receives payment from the drawee his signature is not strictly speaking an indorsement, but it is merely a receipt, although the signature is usually called an indorsement and for convenience we have so referred to it: 56 Am. Law Reg. (N. S.) 122; 4 Har. Law Rev. 297; Brannan's Neg. Inst. Law (3 ed.), 323; 17 Har. Law Rev. 581–583. The liability of the holder to refund when he has received payment on a check coming to him through a forged indorsement is not dependent upon whether or not the holder has signed his name on the back of the check, for regardless of whether or not he indorses the instrument, the holder is bound to know the genuineness of all prior indorsements: *Wellington Nat. Bank* v. *Robbins,* 71 Kan. 748 (81 Pac. 487, 114 Am. St. Rep. 523). A holder can sue the drawee and compel payment without indorsing a check. A drawee who has paid a check can sue the holder and compel

repayment even though the holder did not indorse the check. In short, the signature of the holder receiving payment is only a receipt. A forged indorsement cannot transfer any interest in the check and the holder therefore has no right to demand the money.

Although all the authorities agree that the drawee has a right to compel the holder to refund money paid on a check having the genuine signature of the drawer but bearing a forged indorsement, they do not agree upon the theory of the obligation which creates the right: 4 Har. Law Rev. 297; *Farmers' Nat. Bank* v. *Farmers & Traders' Bank,* 159 Ky. 141 (166 S. W. 986, L. R. A. 1915A, 77); Brannan's Neg. Inst. Law (3 ed.), 230. As pointed out by the editor of the note in *First Nat. Bank of Lisbon* v. *Bank of Wyndmere* (N. D.), 10 L. R. A. (N. S.) 49, the warranty of the drawee in respect of the signature of the drawer is governed by a rule of the law-merchant, while recovery by the drawee of payment made on a forged indorsement is dependent upon common-law rules with reference to recovery of money paid by mistake: *Crocker-Woolworth Nat. Bank* v. *Nevada Bank,* 139 Cal. 564, 584 (73 Pac. 456, 96 Am. St. Rep. 169, 63 L. R. A. 245).

Thus far we have discussed the check as it stands alone, and without regard to the clearing-house rules. We have determined that the law of the land requires a holder to refund to the drawee a payment received on a forged indorsement, but we have also determined that the holder is not required to refund money paid on a check which was invalid from the beginning on account of the forgery of the signature of the drawer. If we turn to the rules of the clearing-house we shall see that a member guarantees

prior indorsements, but that the guaranty extends no further; and, therefore, under the rules of the clearing-house as well as under the laws of the land payment made on a forged indorsement must be refunded by the holder. The members of the clearing-house have supplemented the law by agreeing that the clearing-house stamp used by a member when clearing items, except certificates of deposit, "shall be for clearing-house purposes only, and shall guarantee the validity and regularity of all prior indorsements." The members of the clearing-house were entitled to make such a rule for their government and it is binding upon them: *Crocker-Woolworth Nat. Bank* v. *Nevada Bank,* 139 Cal. 564, 580 (73 Pac. 456, 96 Am. St. Rep. 169, 66 L. R. A. 245). It is of interest to note that the clearing-house rules involved in *Crocker-Woolworth Nat. Bank* v. *Nevada Bank* were in part exactly like and in part substantially like those of the Portland Clearing-house.

It will be remembered that the stamped indorsement placed by the defendant on the back of the checks did not include the words "Prior indorsements guaranteed"; but the rules of the clearing-house do provide that the stamped indorsement operates as a guaranty of prior indorsements. As previously pointed out the negotiable instruments law provides for warranties made by the indorser and those warranties are for the benefit of subsequent holders only. It has also been pointed out that the general rule is that a drawee can recover moneys paid on a forged indorsement, but that the authorities place the right of recovery upon different grounds, some placing the right upon the ground of warranty or guaranty, and many others placing the right upon the ground of mistake: Note in L. R. A. 1916E,

541. We need not attempt to decide whether the words "prior indorsements guaranteed," if they appeared on the backs of the checks as a part of the written indorsements, would constitute a contract of guaranty made for the benefit of the drawee as well as for subsequent holders; for in the instant case it is manifest that the clearing-house rules with reference to the guaranty of prior indorsements were intended by the members of the Clearing-house Association to be available to a drawee bank. Hence, a member of the Clearing-house Association receiving money on a forged indorsement must refund whether his liability is viewed: (1) In the light of the principles of the common law governing the recovery of money paid by mistake; or (2) in the light of the guaranty which by the rules of the Clearing-house Association is attached to an indorsement for the benefit of the drawee.

The clearing-house rule which provides for the guaranty of prior indorsements refers to the signatures of indorsers and does not include drawers: *Farmers & Merchants' Bank* v. *Bank of Rutherford,* 115 Tenn. 64 (88 S. W. 939, 112 Am. St. Rep. 817); *National Bank of Rolla* v. *First Nat. Bank of Salem,* 141 Mo. App. 719 (125 S. W. 513); *State Bank* v. *Cumberland Savings & Trust Co.,* 168 N. C. 605 (85 S. E. 5, L. R. A. 1915D, 1138; *Cherokee Nat. Bank* v. *Union Trust Co.,* 33 Okl. 342 (125 Pac. 464).

6. In the instant case it must be remembered that the checks were never at any time valid subsisting orders; they were not orders originally valid but subsequently unlawfully changed by the addition of an invalid incident. The checks involved here as well as all their incidents were invalid from the very beginning. The loss incurred by the plaintiff is trace-

able to the act which originated the checks. The loss sustained by the plaintiff was caused by its failure to detect the forgery of the drawer's signature. From the moment of their origin the checks were invalid because not bearing the genuine signature of the drawer. If the indorsements of Rose and Shea be treated as forgeries, the plaintiff is nevertheless precluded from recovering for the reason that the plaintiff failed to detect the forgery of Insley's signature. The forged indorsements of Shea and Rose, assuming them to be forgeries, put the plaintiff in no worse position than it would be left if the indorsements were genuine. The First National Bank cannot be called upon to pay again, and the United States National Bank has not received the proceeds of an instrument to which another had a better title: *United States* v. *Chase Nat. Bank,* 252 U. S. 485, 495, (64 L. Ed. 675, 40 Sup. Ct. Rep. 361); *Bank of Williamson* v. *McDowell County Bank,* 66 W. Va. 545 (66 S. E. 761, 36 L. R. A. (N. S.) 605, 614); *State Bank* v. *Cumberland Savings & Trust Co.,* 168 N. C. 605 (85 S. E. 5, L. R. A. 1915D, 1138); *First Nat. Bank of Marshalltown* v. *Marshalltown State Bank,* 107 Iowa, 327 (77 N. W. 1045, 44 L. R. A. 131).

If, as the trial court found, the payees named in the checks were fictitious payees, then under Section 7801, Or. L., which corresponds with Section 9 of the uniform negotiable instruments law, as that section has been interpreted by some adjudications, the checks were payable to bearer and hence title was not derived through forged indorsements, but merely by delivery: 8 C. J. 608; *Trust Co. of America* v. *Hamilton Bank,* 127 App. Div. 515 (112 N. Y. Supp. 84); *Bank of England* v. *Vagliano Bros.,* L. R. [1891] App. Cas. 107.

We may summarize the foregoing decision as follows: The doctrine of *Price* v. *Neal* is adopted by the negotiable instruments law; and consequently a drawee who pays bears the risk of the drawer's signature being a forgery. If, however, the drawee is innocent of actual fault and the holder is chargeable with bad faith or negligence, the drawee's hands are untied and he can compel the holder to refund. It cannot be said, as a matter of law, that the defendant was guilty of negligence on account of its failure to detect the forgery of the signature of the drawer, even though the defendant had among its files the genuine signature of the drawer. If the checks are considered alone, and the rules of the clearing-house are for the moment eliminated, we find that the act of presenting the checks for payment is neither a representation nor a warranty made by the holder to the drawee that the signature of the drawer was genuine, and we further find that the indorsements placed by the holder upon the back of the checks did not constitute representations or warranties of the genuineness of the drawer's signature. The holder must refund where he has received payment on a forged indorsement of the check if the check bore the genuine signature of the drawer. The obligation to refund payment received on a forged indorsement exists whether the checks are considered alone or in connection with the clearing-house rules. If the checks are considered alone the rules of the common law enable the drawee to recover; if the checks are considered in connection with the clearing-house rules the drawee can recover on the guaranty which the clearing-house rules attached to the indorsement of the holder. But the rule which permits a drawee to recover payment made on a forged indorsement is

not available to the plaintiff, because the signature of the drawer was forged and the instrument was never at any time valid, but from the very beginning was an invalid order in its entirety. The plaintiff did not pay on a genuine instrument bearing a forged indorsement; but payment was made on a paper to which the name of the drawer was forged, and since the plaintiff is bound to know the signature of the drawer, it paid at its peril.

We do not find it necessary to decide whether Article XVI, Section 1 of the clearing-house rules is applicable to the situation presented here. Without intending to indicate our opinion upon the subject, the reader's attention is directed to *National Bank of Commerce* v. *Mechanic's American Nat. Bank,* 148 Mo. App. 1 (127 S. W. 429). Nor need we inquire whether Section 7980, Or. L., concludes the plaintiff. However, the following precedents may be consulted: *First National Bank* v. *Bank of Cottage Grove,* 59 Or. 388, 396 (117 Pac. 293) ; *Cherokee Nat. Bank* v. *Union Trust Co.,* 33 Okl. 342 (125 Pac. 464).

The conclusions we have reached compel an affirmance of the judgment.                      Affirmed.

Burnett, C. J., and McBride and Bean, JJ., concur.