### UNITED STATES *v.* STOCKGROWERS' NAT. BANK OF PUEBLO.

*(Circuit Court, D. Colorado. May 4, 1887.)*

POST-OFFICE—FRAUDULENT ISSUES OF POST-OFFICE ORDERS—AGENCY—ESTOPPEL.

    A postmaster at Lewiston, Idaho, with intent to defraud the government, and without receiving any money, issued post-office orders upon the postmaster at Pueblo in favor of the Stockgrowers' Bank. He mailed the orders to the bank with a letter purporting to be written by one Wilson, and directed the bank to draw the money, and hold it subject to said Wilson's order. The

bank, without knowledge of the fraud, obtained the money as directed, but in doing so acted as a principal without disclosing their agency in the matter. The Lewiston postmaster, under the name of Wilson, subsequently drew the greater part of the money from the bank, and suit was afterwards brought against it by the United States to recover the money so obtained on the orders. *Held,* that the bank was liable.

On Demurrer to Answer.
*H. W. Hobson,* for plaintiff.
*J. Q. Richmond,* for defendant.

BREWER, J. The case of the United States against the Stockgrowers' National Bank is a case where the court has to traverse a field in which it finds little light from authority, and no case exactly in point. The facts are these: The postmaster at Lewiston, Idaho, seeking to defraud the government, issued certain post-office orders upon the post-office at Pueblo in favor of the Stockgrowers' Bank, the defendant here. As a matter of fact he received no money, and it was a cunningly devised and fraudulent scheme to rob the government. The post-office orders he mailed in a letter purporting to be written by one J. G. Wilson to the defendant bank, directing it to present the orders, draw the money, and hold it subject to his order. The amount which was thus drawn from the post-office was $600, which was received, deposited, and held by it to the credit of J. G. Wilson. Shortly thereafter the Lewiston postmaster as Wilson drew $500 of that amount from the bank. The other hundred dollars remained there at the time this suit was commenced. The government, in the course of time, finding these post-office orders were fraudulently issued by its postmaster at Lewiston, caused him to be arrested and prosecuted, and instituted this suit to recover from the bank the $600 which it had received. The bank makes no claim to the hundred dollars which it has not paid over, but defends as to the $500 which it had paid over before this suit and before notice.

Section 4057 of the Federal statutes provides that in all cases where money has been paid out of the funds of the post-office department under the pretense that service has been performed therefor, etc., "and in all other cases where money of the department has been paid to any person in consequence of fraudulent representations, or by the mistake, collusion, or misconduct of any officer, or other employe in the postal service, the postmaster general shall cause suit to be brought to recover such wrong or fraudulent payment, or excess, with interest thereon." That this money was obtained wrongfully from the government is undoubted. If it is regarded as a transaction between the postmaster at Pueblo and the defendant bank, both that officer and that bank were innocent of intentional wrong. Both acted under the mistaken belief that those post-office orders were rightfully issued, and were valid obligations of the government. If it be regarded in the light of a transaction between the government on the one hand, as represented by its two postmasters, that at Lewiston and that at Pueblo, and the Stockgrowers' Bank on the other hand, then it was money wrongfully obtained from the government

through the misconduct of one of its officers. In either case, within the strict words of that statute, money has been wrongfully obtained from the government by this defendant bank. But that only brings up the real difficulty in the case. An ordinary principal whose agent is guilty of wrong, but who acts within the scope of his apparent authority, is bound by such acts so far as affects innocent third parties. In other words, under these cases, the principal assumes the burden of his agent's conduct: if it is wrongful, the principal only suffers, and innocent third parties are safe. That, with perhaps certain limitations, is the universal rule applying to the doctrine of principal and agency so far as private individuals are concerned. It is an open question under the authorities as yet whether the converse of that rule does not apply to the government and its agents. Many courts have in a general way affirmed that whatever of hardship there may be in particular instances, the general weal of the public requires that the individual and not the government should bear the burden of the conduct of the government's agent. It is undoubtedly true, as settled by the case of *Cooke* v. *U. S.*, 91 U. S. 389, that when the government descends from its position as sovereign and deals in negotiable paper, it subjects itself to the ordinary rules controling negotiable paper the same as any individual. But these post-office orders are not negotiable paper; they are orders drawn by one postmaster upon another, payable to a particular person not named in the order itself, unknown save as to the particular parties to the transaction—the two postmasters and the party who obtains them—so that the protection which the rules applicable to negotiable paper would lay around many transactions do not avail the defendant in this case. The strength of the defense lies in the fact that it claims to have been acting as an agent simply; it was not seeking to get money for itself from the post-office at Pueblo; it presented these orders as the agent for this unknown party, this J. G. Wilson, and for him obtained this money from the post-office; and, in obedience to the directions of its principal, transferred to him the $500 of the money thus received.

The case of *U. S.* v. *Pinover*, 3 Fed. Rep. 305, contains quite a discussion of the circumstances under which an agent is relieved from responsibility. That and the cases cited therein lay down what I think is the correct rule, that one who deals with the government as an agent, or representing himself or known to be an agent, receives money as such agent, and pays it over to his principal before notice of any wrong, is protected. He has in his dealings with the government come to it as the agent of a third party, and the government has assumed to deal with him as the agent of this third party, and if it afterwards turns out that there is any wrong in the transaction—I mean a wrong not personal to the agent—the government must look to this undisclosed or disclosed principal, because it has assumed to treat with this party as an agent for some principal; but where the party deals with the government as a principal, although he may be in fact an agent, the government has a right to treat him as a principal, and say: We deal with you as a principal; we know not the fact of your agency, and we may hold you as principal.

Now, these post-office orders were drawn payable to the order of the defendant bank; it presented them as its own; it obtained the money. So far as these pleadings show, neither the postmaster at Pueblo nor any government official except the wrongdoer knew otherwise than that this Stockgrowers' Bank was the principal owning or claiming this money; the party intending to appropriate this money to its own benefit. The government dealt with it as a principal, paid the money to it as a principal, and under those circumstances, within the rule thus laid down, the government has a right to say: Although you were in fact only an agent, we did not know you as such; we dealt with you as a principal; you made no representations to us of the position which you were occupying or the agency which you now claim, and we hold you, therefore, as a principal.

It is further said that a party who accepts and pays what purports to be his own paper cannot thereafter recover the money thus paid. It is his duty when the paper is presented to him, if it is a forgery, to detect it and refuse payment; and that the government, through its officer at Pueblo, accepted this, which purported to be the paper of the government, and having accepted it and paid it to a party who was innocent of wrong, is estopped from recovering.

In the case of *Cooke* v. *U. S.*, *supra*, certain treasury notes were received by the subtreasurer at New York and paid, and when they were thereafter sent to Washington, it was discovered that they were forgeries, and the right of the government to maintain the action was sustained; the supreme court holding that this subordinate officer, the subtreasurer in New York City, was not the one who finally represented the government so as to determine upon the genuineness and validity of this paper which was presented and paid by him.

The statutes in respect to the post-office department are meager. It says that the postmaster general may provide for post-office orders. It does not specifically, or in terms commit the final determination of the validity of these orders to any local postmaster. So, within the reasoning of the supreme court in that *Cooke Case*, it seems to me that it must be held, and there are some equitable reasons for so holding, that until this matter has come to the knowledge of the department at Washington, so that there has been time for the action of the principal representative of the government in this business, there is no such estoppel as ordinarily runs from the acceptance and payment of forged paper.

There is nothing in this record, as it is now presented, from which I can say whether there was any negligence on the part of the government after the postmaster general at Washington had obtained cognizance of these facts. Indeed, I may say that while counsel discussed this case upon the general facts as I have stated, yet the question is technically raised upon a demurrer to the answer, and I have had some doubts as to whether the pleadings were such that the questions were fully represented by that demurrer, or the pleadings as they stand. Certainly upon this last question I see nothing to show the time at which knowledge of these facts was brought home to the department at Washington, or no-

tice given to the defendant; the only dates being the presentation of the post-office orders, etc., and the commencement of this suit.

I feel constrained, therefore, to sustain the demurrer to these answers. Whatever question there may come hereafter of negligence on the part of the government I think must be presented in some further pleading.