GERMANIA BANK OF MINNEAPOLIS v. WILLIAM T. BOUTELL and. Others.[1]

February 1, 1895.

No. 9052.

Payment of Forged Paper—Recovery.

*Held* that, upon the facts stated in the complaint, the case comes within the rule that where the drawee of a bill of exchange, or the banker upon whom a check has been drawn, pays a check or bill upon which the drawer's signature has been forged, he cannot recover back the amount if the party to whom he paid it was a bona fide holder.

Action against William T. Boutell and another doing business as Boutell Brothers, the firm of Boutell Brothers, and the Washington Bank. Appeal by plaintiff from an order of the municipal court of Minneapolis, Holt, J., sustaining separate demurrers to the amended complaint. Affirmed.

*Chas. G. Laybourn,* for appellant.

*John M. Miller,* for respondents Boutell Brothers.

*A. Ueland,* for respondent Washington Bank.

MITCHELL, J. This action was brought to recover money paid on a forged check. To the complaint the defendants separately demurred, on the ground that it did not state a cause of action. This appeal is from an order sustaining these demurrers. The complaint is very prolix, but the substance of its allegations is as follows: Osborne & Clark, lumber dealers in Minneapolis, were customers of the plaintiff bank, with which they kept a large deposit. They had in their employ a man named Seymour, at a salary of $7 per week, "a man of limited means and small personal resources," which

1 Reported in 62 N. W. 327.

facts were known to Boutell Bros. Boutell Bros. had sold Seymour some goods on credit on the instalment plan, upon which there was due an instalment of $10. During business hours of April 11, Seymour went to Boutell Bros.' place of business in Minneapolis, with a check for $457.90, payable to his own order, purporting to be drawn by his employers, Osborne & Clark, on plaintiff bank; whereupon Seymour and Boutell Bros. both indorsed the check for the purpose of giving it credit and putting it in circulation, and to enable Seymour to pay the $10, and then went over to the defendant bank, and presented the check thus indorsed (Boutell Bros. identifying Seymour), and requested the bank to cash it, which it did, paying the money to Seymour and Boutell Bros. Although the places of business of both Osborne & Clark and of plaintiff were within a few blocks, and of ready access, Boutell Bros. made no inquiry to ascertain the genuineness of the check, and the defendant bank took no means to assure itself of the fact, except the identification of Seymour by Boutell Bros. and the indorsement of the check by the latter. The next day the defendant bank presented the check to the plaintiff, which, after examining the signature and believing it to be genuine, induced thereto by its apparent genuineness (it not being possible by ordinary care to detect the forgery), and by the financial standing and integrity of the defendant bank, which presented it, and of Boutell Bros., who had indorsed it, "in the exercise of due care and caution," paid the check.

It is also alleged that it was the custom and practice among all the banks in Minneapolis, well known to the defendants, for the bank upon which any check purports to be drawn to pay it when presented by any other bank (provided the drawer has sufficient funds), relying upon the genuineness of the check and of all prior indorsements; also not to pay a check "of any considerable size" purporting to be drawn by one of its depositors unless the party presenting it is identified, "save when indorsements of responsible parties known to the drawee bank are indorsed thereon." On April 24 plaintiff discovered that the signature of Osborne & Clark was a forgery, and immediately notified the defendants of the fact, tendered back the check, and demanded payment of the amount, which was refused. The signature of Osborne & Clark had been forged by Seymour, who absconded April 12, the same day on which

plaintiff paid the check, but whether before or after is not alleged. His whereabouts is still unknown.

These facts present the question, upon which so much has of late years been said and written, whether the drawer of a bill of exchange, or the banker upon whom a check has been drawn, who has paid a bill or check upon which the drawer's signature has been forged, can, upon discovery of the forgery, recover back the amount from the holder, and, if so, under what circumstances he may thus recover. It is a well-settled rule of law that money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund. And the tendency of the modern authorities is to extend rather than to curtail the operation of this rule. One generally received exception to the rule is that where the drawee of a bill of exchange, or the banker upon whom a check has been drawn, pays a bill or check upon which the drawer's signature has been forged, he must stand the loss, and cannot recover back the amount, if the party to whom he paid it was a bona fide holder.

This doctrine was established in England in 1762, in the leading case of Price v. Neal, 3 Burrows, 1355, in which Lord Mansfield stopped defendant's counsel, saying the case was one that could not be made plainer by argument; that it was incumbent upon the plaintiff (the drawee) to be satisfied that the bill drawn upon him was in the drawer's hand before he accepted or paid it. The same doctrine was firmly established in the commercial law of this country in Bank of U. S. v. Bank of Georgia, 10 Wheat. 333, in which Mr. Justice Story, referring to Price v. Neal, said: "After some research, we have not been able to find a single case in which the general doctrine thus asserted has been shaken or even doubted." And, so far as we have been able to discover, this general doctrine is recognized as the law by the courts of every state in the Union except Pennsylvania, where the rule has been changed by statute. The doctrine was announced and applied by this court as early as Bernheimer v. Marshall, 2 Minn. 61 (78). That was a case of a forged draft, but the doctrine is equally applicable to a forged check. Indeed, if there is any difference in the cases, the reasons upon which

the doctrine rests apply with more force to the latter than the former, for not only do checks pass from hand to hand as money more frequently and rapidly than do drafts or ordinary bills of exchange, but a banker is "even more bound" to know a customer's handwriting than a drawee of a bill of exchange is bound to know the drawer's.

Many modern text writers, some of them of learning and ability, have assailed the correctness of this doctrine, contending that the general rule as to money paid under mistake of fact should apply, and that the law ought to be that the bank, although at fault in not discovering the forgery of its customer's signature, can recover even from an innocent holder, if he will then be in no worse condition than if the bank had refused to pay the draft or check. See 2 Pars. Notes & B. 80; Morse, Banks, c. 33; Daniel, Neg. Inst. c. 42; also, Am. Law Rev. April, 1875, p. 411, and note to People's Bank v. Franklin Bank, 17 Am. St. Rep. 889 (88 Tenn. 299, 12 S. W. 716). We shall not enter upon a consideration of the soundness of the argument against the doctrine, or as to which rule we would adopt if the question was res integra, because we do not feel at liberty to overrule or disregard a doctrine so well established and so firmly rooted in the commercial law of the country. If the rule is incorrect or works badly in practice, its change must be left to the legislature. We may say, however, that the opponents of the doctrine seem to have found no followers among the courts. We may also suggest that perhaps the courts themselves have given the opponents of the doctrine an unnecessary vantage ground, by frequently placing it exclusively on the narrow ground of actual negligence on part of the drawee in not discovering the forgery, because he was bound to know the signature of his own customer or correspondent. It is undoubtedly true that he is in better position than a stranger to know his customer's signature, and that men have a right to deal with checks and drafts on that assumption; but it does not seem to us that the doctrine rests entirely on this narrow basis of actual negligence on the part of the drawee. The money of the commercial world is no longer coin. The exchanges of commerce are now made almost entirely by means of drafts and checks. It was largely in deference to this fact that the recovery of money paid on paper of this kind, to which the drawer's signature was forged, was made an exception

to the general rule as to the recovery of money paid under a mistake of fact. In view of the use of this class of paper as money, it was considered that public policy required that, as between the drawee and good-faith holders, the drawee bank should be deemed the place of final settlement where all prior mistakes and forgeries should be corrected and settled once for all, and, if not then corrected, payment should be treated as final; that there must be a fixed and definite time and place to adjust and end these things as to innocent holders; and that that time and place should be the paying bank and the date of payment; and that, if not done then, the failure to do so must be deemed the constructive fault of the payee bank, which must take the consequences. /See dissenting opinion of Mr. Justice Snodgrass in People's Bank v. Franklin Bank, 88 Tenn. 299, 12 S. W. 716.

The rule that, if a bank pays a check under the misconception that it has funds of the drawer, it cannot recover from a bona fide holder, but must look to the drawer alone for redress, is founded on much the same reasons. There is not as much force as may at first seem in the suggestion of practical objections to the doctrine. In large commercial centers, where vast numbers of checks have to be rapidly exchanged between banks, it is always done through and under the clearing-house rules, adopted by the banks for mutual convenience, by which checks paid in that way may be returned within a certain time, if it be found that they are not genuine or that the drawer had no funds. And the doctrine has no application to cases where, as is common in cities, a customer of a bank deposits checks purporting to be drawn on other banks. Entirely different principles apply to such cases. But while the general doctrine is too well established to be overruled or disregarded, yet it is undoubtedly true that the trend of the modern authorities is to impose upon it some limitations and modifications; so that it is not always easy to definitely state when a case falls within the doctrine or comes within the general rule as to money paid by mistake. From what examination we have been able to make of the authorities, we have arrived at the conclusion that there are very few well-considered cases which go further than to hold that the bank may recover back money paid on a check to which the signature of one of its customers was forged, when there was a lack of good faith on part of

the payee towards the bank, as when he knew the check was forged, or knew of circumstances casting suspicion on its genuineness not known to the bank, and which he did not communicate to it, or where the holder was negligent in not making due inquiry as to the validity of the check before he took it, and the drawee, having a right to presume that he had made such inquiry, was itself thereby excused from making inquiry before paying it. In the first case the holder is really a party to the fraud, and is not a good-faith holder. In the second case, he has, by his negligence, contributed to the consummation of the mistake on the part of the drawee by misleading him.

There is no allegation that either of the defendants knew or suspected that the check was forged. So far as appears, they both acted in entire good faith. All that is claimed against either is negligence. It remains only to consider whether either is charged in the complaint with any act of negligence in failing to make proper inquiry as to the genuineness of the check, and which the plaintiff assumed, and had a right to assume, that they had made, so as to excuse it for not making the investigation as to the genuineness of its own customer's signature which it otherwise would have made. So far as the defendant bank is concerned, there is only or to the question. When it was requested to cash a check purporting to be drawn by one not its customer, on another bank, payable to a person unknown to it, it took the precautions, which any prudent bank would have taken, to have the payee identified and the check indorsed by a responsible party, and thereby protect itself against loss in case the check was not honored when presented for payment. This is just what any bank would naturally do, and has a right to do, under such circumstances, instead of going in search of the maker of the check to ascertain from him if his signature is genuine, and then going to the drawee bank to ascertain if he has funds on deposit with which to meet it. It owed the plaintiff no duty to investigate as to the genuineness of the signature of its own customer, and the plaintiff had no right to assume that it had made such investigation. It seems to us that the same is true as to Boutell Bros. The distinction must be kept clearly in mind between their duty and responsibility to the defendant bank or any other bona fide indorsee of the check, and their duty and responsi-

bility to the plaintiff bank, with reference to the genuineness of the signature of its own customer. By indorsing the check, Boutell Bros. undoubtedly guaranteed to the defendant bank the genuineness both of Osborne & Clark's signature and of Seymour's indorsement as the payee. That was the very purpose of their indorsement. And if the indorsement of Seymour had proved to be forged, they would no doubt have been liable to plaintiff had it been thus led to pay the check to one not the owner of it; for by indorsing it they guaranteed to all persons, including plaintiff, the genuineness of the preceding indorsement. But upon the question of the genuineness of the signature of Osborne & Clark, the drawee's own customers, the case stands upon an entirely different footing. Not being the original payees of the check, the indorsement of Boutell Bros. constituted no guaranty or representation to the drawee that the signature of the drawer was genuine; and the plaintiff had no right to rely on it as such, or to assume that Boutell Bros. had investigated as to its genuineness. That was a matter which it devolved on the plaintiff to ascertain for itself when the check was presented. In fact, the complaint negatives the idea that the plaintiff relied on any such assumption; for it is alleged that it did examine the signature with due care and caution, that it was to all appearances genuine, and that it was not possible by any ordinary care or precaution to detect the forgery.

Our conclusion is that as to both demurrers the order appealed from must be affirmed.

CANTY, J. (dissenting). I cannot concur in the foregoing opinion. Because error is gray with age is no reason why it should be respected or followed. It seems to me that the foregoing opinion is a mere apology for such error, and this is true of the opinion in most of the modern cases on the question here involved. I concede that it is good public policy to hold that a banker should know the signature of his depositor. It tends to greater vigilance on the part of the banker, and more prompt discovery of the forgery, which makes the business of forgery more dangerous and less successful. But it does not follow that this is the only principle involved in this kind of a case, or that it should overturn and exclude all other well-established principles applicable thereto. There is no stronger or bet-

ter established principle of law or public policy than that which holds that no one shall be allowed to retain the consideration received by him on a forged instrument, however innocent he may be, unless he can invoke the aid of the doctrine of estoppel. Even when a person has been deceived by the forgery of his own signature, and has paid the forged obligation, he may recover back the money so paid from an innocent holder. Welch v. Godwin, 123 Mass. 71; 2 Morse, Banks, § 464. This principle tends to cause greater vigilance on the part of every one about to take such paper, and to prevent him, when he has taken it, from suppressing his suspicions, and putting the paper off on some one else, instead of investigating the matter and pursuing the guilty parties. Why should the law in such a case offer a premium on attempting to put the paper off on the drawee bank? The money of a bank is not legitimate plunder, and a person receiving it through mistake and without consideration ought not to be entitled to retain it. The mere fact that a bank pays a forged check drawn upon it is no reason why it should lose its money. It was the absolute duty of the bank to know its depositor's signature, and detect the forgery, and it should suffer any loss caused by its failure to perform that duty; but there is no principle of law which says that, when such failure has caused no loss, the bank shall, as a mere penalty, forfeit the money so paid by it.

The transfer of negotiable paper by one holder to another is accompanied by an implied warranty that the paper is genuine. Brown v. Ames, 59 Minn. 476, 61 N. W. 448. But, when a bank pays a check drawn upon it, there is no such implied warranty that the signature of the maker is genuine. On the contrary, it is the duty of the bank to ascertain, when the check is presented, whether or not the signature to it is genuine. It owes this duty not only to the innocent holder presenting the check, but also to all prior innocent holders. If it fails in this duty, it can only recover back the money so paid by it on the ground that it was paid and received by mutual mistake and without consideration, and that none of the successive innocent holders through whose hands the check passed will suffer any loss by reason of such failure if compelled to return the consideration received by him; that is, that none of such innocent holders will be in a worse position when he has returned such

consideration than he would be if the check had not been paid by the bank. There is no reason why this rule should lead to multiplicity of actions, or result in conditions too complex for practical solution. When the bank brings suit against the last holder to whom it paid the check, he can give notice of the suit to the next prior holder of whom he received it, and who is liable over to him on such implied warranty, and thereby bind such prior holder by the result of the suit. See Love v. Gibson, 2 Fla. 598; Kip v. Brigham, 6 Johns. 158, 7 Johns. 168; People v. Judges of Monroe, 1 Wend. 19; Blasdale v. Babcock, 1 Johns. 517; Bigelow, Estop. 84. I see no reason why the second last holder of the check cannot in like manner give notice of the suit to the third last holder of it, and thereby bind him by the result of that suit. And it seems to me that the defense will be entitled to plead and prove the existence of as many successive innocent prior holders as it can, and thereupon the burden should, perhaps, be thrown on the plaintiff bank to prove that none of these holders will be in a worse position when he has, by reason of the recovery of the bank, been compelled to return the consideration received by him, than he would be if the bank had never paid the check.