UNITED STATES v. NORTHWESTERN NAT. BANK & TRUST CO. OF MINNEAPOLIS.

No. 145 Civ.

District Court, D. Minnesota, Fourth Division.

Oct. 25, 1940.

Victor E. Anderson, U. S. Atty., and James J. Giblin, Asst. U. S. Atty., both of St. Paul, Minn. (Robert Kaplan, Dept. of Justice, of Washington, D. C., of counsel), for plaintiff.

Loring M. Staples, of Minneapolis, Minn. (Faegre, Benson, & Krause, of Minneapolis, Minn., of counsel), for defendant.

NORDBYE, District Judge.

The above-entitled cause came before the undersigned, one of the Judges of the above-named Court, without a jury, a jury having been expressly waived.

A stipulation of facts was entered into between the parties, and in addition thereto certain evidence was introduced.

The principal facts are not in dispute. On December 16, 1937, one Luther C. Billings stole from the United States Post Office at Mississippi City, Mississippi, fifty-five United States postal money order blanks, numbered 40,546 to 40,600, inclusive. At the same time, Billings also stole from said Post Office rubber stamps used by the postmistress in printing her name on money orders, the name of the issuing Post Office, and the date. Thereafter, Billings filled out twelve of the stolen blanks, numbered 40,579 to 40,590, inclusive, by stamping the name of the postmistress, the name of the Post Office, and the date, January 11, 1938, thereon. On the blank reserved for the purpose, he wrote the name of J. H. Trent as the payee, and the name of J. W. Martin as the remitter; Minneapolis, Minn., as the name of the Post Office to which the orders were directed, and the sum of $100 as the face amount of each money order. No application was filed for said orders, no money was paid to the issuing Post Office, and all of the stamping or writing thereon was done without the knowledge or authority of the postmistress at Mississippi City. It was apparently the custom to stamp the name of the postmistress on genuine money orders, so that these spurious money orders had every appearance of being genuine.

On January 14, 1938, Billings, representing himself as J. H. Trent, the payee in the money orders as filled out, presented himself to the Lake Street office of the defendant bank, and the bank, believing in good faith the postal money orders to be valid, and that Billings was J. H. Trent, the payee named therein, cashed the orders, paying to said Billings $50 in cash, $650 in travelers' checks payable to J. H. Trent, and the balance of $500 was placed to the personal credit of J. H. Trent at the bank. Prior to the cashing of said money orders, one of the clerks at the bank called the branch Post Office at Lake Street on the telephone. Some person, presumably a clerk in the branch Post Office, answered the telephone, and in response to the bank clerk's inquiry, stated that the postal orders as described over the telephone were genuine. The various clerks who were on duty at the branch Post Office when the call was made denied that any such conversation took place, and denied that any call was made. It is quite probable, however, that the inquiry was made as related by the bank clerk, and that some employee in the Post Office, through mistake and inadvertence, overlooked the fact that on December 29, 1937, and January 11, 1938, The Postal Bulletin published at Washington, D. C., and on file at the branch Post Office in question on the date the inquiry was made, listed as stolen money order forms from Mississippi City, blanks numbered 40,546 to 40,600, inclusive.

On January 17, 1938, the defendant presented said postal money orders, duly endorsed by it, to the main Minneapolis Post Office and was paid the sum of $1,200 out

of the funds of the United States on hand at said Post Office. The payment was made by an employee of the money order section in mistaken belief that the said orders were valid and lawful. It further appears that the postal employee in the electrical counting section, charged with the duty of examining lists of paid money orders, failed to detect as stolen orders the postal orders involved herein, and they were forwarded to the General Accounting Office of the Post Office Department at Washington, D. C., as valid, and the spurious nature of said orders was not detected by the Department until January 22, 1938. Without any unreasonable delay, this suit was thereafter instituted.

█ It seems clear that the bank possessed nothing of value when it cashed the money orders for Billings. If the Post Office Department had refused payment when the money orders were presented, no claim against the Government would exist, notwithstanding the telephone conversation as claimed. The favorable assurance of some clerk in the Post Office as to the genuineness of the postal orders did not prejudice the Government's right to refuse payment of the spurious orders. There is no provision in the law or in the postal regulations for the acceptance of postal money orders, except by presenting them for payment and the cashing thereof at the Post Office or some designated government agency. Consequently, while the bank's position seems free from negligence, and no situation arose which caused the bank to suspect the fraudulent character of the orders, the situation nevertheless requires a finding that the bank parted with nothing of value when it presented the false money orders for payment on January 17, 1938. In other words, it parted with nothing of value and received from the Government $1,200 in cash. Obviously, there was a mutual mistake. The employees of the Post Office Department were negligent, but the bank had cashed the money orders for Billings and parted with its money and credit before the spurious orders were presented for payment. The negligence of some unknown clerk in responding to the telephone call cannot prejudice the Government's position in the carrying out of an act of sovereignty. At least, without some evidence as to the authority of the clerk who responded to the telephone call, the incident is of no particular significance in determining the issues presented. What, then, are the rights of the parties?

█ The money order system was established in 1864, pursuant to an Act of Congress. The reasons for the establishment of the system may be gathered from the first section of the Act, now 39 U.S.C.A. § 711, which reads: "To promote public convenience, and to insure greater security in the transfer of money through the mail, the Postmaster General may establish and maintain, under such rules and regulations as he may deem expedient, a uniform money-order system, at all suitable post offices, which shall be designated as 'money-order offices.' "

The establishment of the money order system is concededly within the constitutional powers wherein the Government is vested with the right to "establish Post Offices and post Roads." Const. art. 1, § 8, cl. 7. It is incident to the paramount right of Congress to maintain a post office system. While the growth of the money order system may have assumed some aspects of commercial banking, it must nevertheless be characterized as a function of sovereignty and not a commercial operation. The operation of the post office system, with its many innovations inaugurated to meet a great public need, does not divest it of its character of sovereignty. When postal money orders are issued, the primary object is to further the safety of the postal system; to insure the sanctity of the mails from loss and theft which more frequently occurs when currency is transmitted through the mails. That the postal money order system is carried on solely for the convenience of the public seems free from doubt.

█ Equity recognizes the right to recover money paid through mistake, and the negligence of the payor does not affect the right of such recovery. In other words, if a benefit is bestowed through mistake, no matter how careless or inexcusable the act of the bestower may have been, the recipient of the benefit in equity must make restoration, the theory being that the restitution results in no loss to the recipient. He merely received something for nothing. Woodward, The Law of Quasi Contracts, 1913, §§ 15 and 92. In the instant situation, the bank received $1,200 for worthless pieces of paper. There are, however, exceptions to the rule, and equity may require or apply a different principle in exceptional cases. In substantiation of its right to retain the proceeds of the money orders, the defendant urges that the doctrine of Price v. Neal, 1762, 3 Burr. 1354, governs the

equities herein. Briefly stated, the principle enumerated in this case is as follows: When the drawee of a bill of exchange, not knowing that the bill is forged, pays the same to an innocent holder, the drawee cannot recover the payment made. Recovery is denied even though the drawee's mistake is due to excusable neglect or ignorance. Many theories are advanced in explanation of this doctrine. Most textwriters and jurists agree as to the wholesomeness of the equitable doctrine as applied in Price v. Neal, but disagree as to the reasons for the principle and the scope to which it should be applied. See Ames's The Doctrine of Price v. Neal, 4 Harvard Law Review 297; Woodward's The Law of Quasi Contracts, p. 126 et seq. Some writers contend that the negligence of the drawee determines the equities; others that the drawee cannot recover because he is presumed to know the drawer's signature, and having once honored the bill, equity will leave the parties where they are. Some writers urge that, as between two people having equal equities, one of whom must suffer, the legal title shall prevail. This latter view is advanced by Professor Ames. Woodward, however, after considering the various theories advanced, suggests that the rule is one of policy, stating (p. 137, The Law of Quasi Contracts): "None of the theories set forth in the preceding sections seems satisfactorily to account for the denial of relief to the drawee in the case of the forgery of the drawer's signature. The true reason for the rule, it is believed, is one of policy—the policy of maintaining confidence in the security of negotiable paper by making the time and place of acceptance or payment the time and place for the final settlement, as between drawee and holder, of the question of the genuineness of the drawer's signature. In most cases, conspicuously where the drawee is the drawer's banker, the business relations between the drawer and drawee are such that, not only is the drawee thoroughly familiar with the drawer's signature and consequently well qualified to discover a forgery, but it is peculiarly convenient for him to solve any doubt by inquiring of the drawer."

See Dedham Nat. Bank v. Everett Nat. Bank, 177 Mass. 392, 59 N.E. 62, 83 Am.St. Rep. 286; Bank of United States v. Bank of Georgia, 10 Wheat. 333, 335, 6 L.Ed. 334. Justice Mitchell, in Germania Bank v. Boutell et al., 60 Minn. 189, at page 192, 62 N.W. 327, at page 328, 27 L.R.A. 635, 51 Am.St.Rep. 519, is in accord with this view. In considering the doctrine of Price v. Neal, he stated: "Many modern text writers, some of them of learning and ability, have assailed the correctness of this doctrine, contending that the general rule as to money paid under mistake of fact should apply, and that the law ought to be that the bank, although at fault in not discovering the forgery of its customer's signature, can recover even from an innocent holder, if he will then be in no worse condition than if the bank had refused to pay the draft or check. See 2 Pars. Notes & B. 80; Morse, Banks, c. 33; Daniel, Neg. Inst. c. 42; also, Am.Law Rev. April, 1875, p. 411, and note to People's Bank v. Franklin Bank, [88 Tenn. 299] (12 S.W. 716) [6 L.R.A. 724], 17 Am.St.Rep. [884], 889. We shall not enter upon a consideration of the soundness of the argument against the doctrine, or as to which rule we would adopt if the question was res integra, because we do not feel at liberty to overrule or disregard a doctrine so well established and so firmly rooted in the commercial law of the country. If the rule is incorrect or works badly in practice, its change must be left to the legislature. We may say, however, that the opponents of the doctrine seem to have found no followers among the courts. We may also suggest that perhaps the courts themselves have given the opponents of the doctrine an unnecessary vantage ground, by frequently placing it exclusively on the narrow ground of actual negligence on part of the drawee in not discovering the forgery, because he was bound to know the signature of his own customer or correspondent. It is undoubtedly true that he is in better position than a stranger to know his customer's signature, and that men have a right to deal with checks and drafts on that assumption; but it does not seem to us that the doctrine rests entirely on this narrow basis of actual negligence on part of the drawee. The money of the commercial world is no longer coin. The exchanges of commerce are now made almost entirely by means of drafts and checks. It was largely in deference to this fact that the recovery of money paid on paper of this kind, to which the drawer's signature was forged, was made an exception to the general rule as to the recovery of money paid under a mistake of fact. In view of the use of this class of paper as money, it was considered that public policy required that, as between the drawee and good-faith holders, the drawee

bank should be deemed the place of final settlement where all prior mistakes and forgeries should be corrected and settled once for all, and, if not then corrected, payment should be treated as final; that there must be a fixed and definite time and place to adjust and end these things as to innocent holders; and that that time and place should be the paying bank and the date of payment; and that, if not done then, the failure to do so must be deemed the constructive fault of the payee bank, which must take the consequences. See dissenting opinion of Mr. Justice Snodgrass in People's Bank v. Franklin Bank, 88 Tenn. 299, 12 S.W. 716 [6 L.R.A. 724, 17 Am.St.Rep. 884]."

If Justice Mitchell's view is sound, then the doctrine is one of public policy, a rule of expediency which should apply in furthering the free mobility of certain types of instruments. It must be recognized that the doctrine is so well established that in the field of negotiable instruments it must be followed by this Court. However, should the doctrine be applied to the payment of forged postal money orders? Does public policy require the extension of the doctrine to such nonnegotiable instruments? That a postal money order is nonnegotiable cannot be seriously controverted. It lacks the essential characteristics of a negotiable instrument. There are numerous restrictions and limitations to be found in the Postal Laws and Regulations which are entirely inconsistent with negotiability. For instance, only one endorsement is permitted; two endorsements invalidate the order. Section 1432, Postal Laws and Regulations of 1932. Payments are withheld under certain enumerated circumstances. Section 1434. Section 1435 provides that if a person is conducting a lottery or distributing money or property by chance, the Postmaster General may forbid the payment of money orders drawn to the order of such persons.

Judge Brewer, of the Circuit Court of the District of Colorado, later a member of the Supreme Court of the United States, in United States v. Stockgrowers' National Bank of Pueblo, 30 F. 912, 914, in referring to postal orders, stated: "* * * It is undoubtedly true, as settled by the case of Cooke v. United States, 91 U.S. 389 [23 L. Ed. 237], that when the government descends from its position as sovereign and deals in negotiable paper, it subjects itself to the ordinary rules controlling negotiable paper the same as any individual. But these post-office orders are not negotiable paper; they are orders drawn by one postmaster upon another, payable to a particular person not named in the order itself, unknown save as to the particular parties to the transaction—the two postmasters and the party who obtains them—so that the protection which the rules applicable to negotiable paper would lay around many transactions do not avail the defendant in this case."

In Jaselli v. Riggs Nat. Bank, 1911, 36 App.D.C. 159, 31 L.R.A.,N.S., 763, Ann.Cas. 1912C, 119, the court stated: "In the determination of this question, the nature of these money orders must be kept in mind. They are not, as suggested by the learned counsel for appellee, negotiable paper (United States v. Stockgrowers' Nat. Bank [C.C.] 30 F. 912), so that the rules applicable to that kind of paper are not controlling here."

In Bolognesi v. United States, 2 Cir., 189 F. 335, 337, 36 L.R.A.,N.S., 143, footnote 2, it is stated: "In view of the fact already noticed that the money order system in this country was apparently modeled after that of England, it is of interest to note that in Fine Art Society v. Union Bank, L.R. 17 Q.B.D. 705, English post office orders were held not to possess the character of negotiable instruments. Indeed it was taken for granted that they were in fact not such instruments, but it was contended that they had been treated as such by the post office, bankers, and other parties. The Master of the Rolls, however, said, in substance, that money orders were so different from negotiable instruments that they could not be regarded as such even upon principles of estoppel."

That the doctrine of Price v. Neal has been applied to the Government in various fields of its activities is fully established by the decisions, but it has only been applied in instances where the Government steps down from its character as a sovereign and utilizes various types of negotiable instruments in facilitating its operations. In an early case, United States v. Bank of the Metropolis, 15 Pet. 377, 392, 10 L.Ed. 774, is found the following statement: "* * * When the United States, by its authorized officer, become a party to negotiable paper, they have all the rights and incur all the responsibility of individuals who are parties to such instruments. We know of no difference, except that the United States cannot be sued. But if the United States sue, and a defendant holds its negotiable paper, the amount of it may be claimed as a

489

credit, if, after being presented, it has been disallowed by the accounting officers of the treasury; and if the liability of the United States upon it be not discharged by some of those causes which discharge a party to commercial paper, it should be allowed by a jury as a credit against the debt claimed by the United States."

In Cooke v. United States, 91 U.S. 389, 396, 23 L.Ed. 237, the court stated: " * * * When the United States become parties to commercial paper, they incur all the responsibilities of private persons under the same circumstances."

See, also, United States v. Chase Nat. Bank, 252 U.S. 485, 40 S.Ct. 361, 64 L.Ed. 675, 10 A.L.R. 1401; United States v. National Exchange Bank of Baltimore, 270 U. S. 527, 46 S.Ct. 388, 70 L.Ed. 717.

It has also been established that, as against the United States, the rights of the holder of its checks drawn upon the Treasurer are the same as those accorded by commercial practices to the checks of private individuals. United States v. Guaranty Trust Company, 293 U.S. 340, 350, 55 S.Ct. 221, 79 L.Ed. 415, 95 A.L.R. 651. But the Court has been referred to no case where, when the Government has not abandoned its character as a sovereign and where it is engaged in the performance of a public duty, it must bear the burden of the negligence or laches of its agents. As wholesome and as necessary as the doctrine of Price v. Neal may be in the field of the law merchant, it should not be unduly extended. As stated by Justice Mitchell in Germania Bank v. Boutell, supra, 60 Minn. at page 193, 62 N.W. at page 329, 27 L.R.A. 635, 51 Am.St.Rep. 519: " * * * But while the general doctrine is too well established to be overruled or disregarded, yet it is undoubtedly true that the trend of the modern authorities is to impose upon it some limitations and modifications; * * *."

If, therefore, we accept the view that the doctrine of Price v. Neal is primarily one of public policy and in furtherance of the mobility of negotiable instruments in the field of the law merchant, no cogent reason is suggested why it should be extended to instruments issued by the Government in connection with the performance of a public duty. Cases involving the cashing of fraudulent postal money orders and the right of the Government to recover from the recipient are few. However, where the question has arisen, the conclusions herein are in accord. In United States v. Stockgrowers' Nat. Bank, supra, a postmaster, with intent to defraud the Government and without receiving any money, issued postal money orders upon a postmaster in an adjoining state in favor of the Stockgrowers' National Bank. He sent the orders to the bank with a letter purporting to be written by one Wilson, and directed the bank to cash the orders and hold the funds subject to Wilson's orders. The bank, without knowledge of the fraud, obtained the money as directed. The postmaster, under the name of Wilson, withdrew from the bank the greater part of the money, and in a suit brought by the United States against the bank to recover the amount of the money orders, the court held that the orders were not negotiable paper and that the rules applicable to negotiable paper did not apply. The court made the following statement (page 915 of 30 F.):

"It is further said that a party who accepts and pays what purports to be his own paper cannot thereafter recover the money thus paid. It is his duty when the paper is presented to him, if it is a forgery, to detect it and refuse payment; and that the government, through its officer at Pueblo, accepted this, which purported to be the paper of the government, and having accepted it and paid it to a party who was innocent of wrong, is estopped from recovering.

"In the case of Cooke v. United States, supra, certain treasury notes were received by the subtreasurer at New York and paid, and when they were thereafter sent to Washington, it was discovered that they were forgeries, and the right of the government to maintain the action was sustained; the supreme court holding that this subordinate officer, the subtreasurer in New York City, was not the one who finally represented the government so as to determine upon the genuineness and validity of this paper which was presented and paid by him.

"The statutes in respect to the post-office department are meager. It says that the postmaster general may provide for post-office orders. It does not specifically, or in terms commit the final determination of the validity of these orders to any local postmaster. So, within the reasoning of the supreme court in that Cooke Case, it seems to me that it must be held, and there are some equitable reasons for so holding, that until this matter has come to the knowledge of the department at Washing-

ton, so that there has been time for the action of the principal representative of the government in this business, there is no such estoppel as ordinarily runs from the acceptance and payment of forged paper."

In Bolognesi v. United States, supra, certiorari denied by the Supreme Court in 223 U.S. 726, 32 S.Ct. 525, 56 L.Ed. 632, the United States brought an action against the defendants to recover money collected by them on certain money orders fraudulently issued by a postal clerk in charge of a sub-station. At the trial, the Government proved the fraudulent issue of the money orders and their collection by the defendants. The latter then offered evidence purporting to show that the money orders were received in good faith and full value was paid for them. The trial court, upon motion of the government, directed a verdict for the United States in the full amount of the claim. The question presented was summarized by the court as follows (page 336 of 189 F.): "The question to be determined by the court is whether, assuming that the plaintiffs in error have adduced proof of their absolute innocence and good faith, the government is entitled to recover on the theory that the orders being in fact fraudulent the plaintiffs in error must suffer the loss and not the government."

In sustaining the direction of a verdict in favor of the Government, the court stated (page 336 of 189 F.):

"In the establishment and operation of the money order system the government exercises a governmental power for the public benefit. It serves the public by furnishing a safe and cheap method for transmitting small sums of money. It carries on the system not for gain, but to supply a public need. It does not engage in business, but stands in its position of sovereignty. Consequently the principles which govern commercial transactions between individuals have little application in this case and the cases are not in point which hold that 'if it (the Government) comes down from its position of sovereignty and enters the domain of commerce it subjects itself to the same laws which govern individuals there.' Cooke v. United States, 91 U.S. [389] 396, 23 L.Ed. 237.

"It follows as a corollary to the conclusion that the government in issuing money orders exercises a governmental function and does not engage in a commercial transaction that money orders are not negotiable instruments subject to the defenses permitted by the law merchant to bona fide holders for value. They stand in marked contrast to notes or similar obligations which the government might issue to obtain money for its own use and upon which it might incur all the responsibilities of a private person."

In summarizing its views in the matter, the court made the following statement (page 338, 189 F.): "Our conclusion in this case has been reached along broad lines. We fully appreciate that in effect we hold that if it have responsible persons to look to, the government cannot lose in the operation of the money order system—that whatever may be the fraudulent conduct of its officers or employés the loss must fall upon the individual. And the principle underlying this conclusion is that any other rule—any rule which would make the government bear the burden of the malfeasance of its officers in the operation of a governmental department and permit individuals, however innocent, to obtain its moneys without responsibility—would entail endless difficulties and losses; would be inimical to the public interest and contrary to public policy."

The equitable doctrine of permitting a recovery where there has been an unjust enrichment is well established in the law and should have greater weight in determining the rights of the parties where postal money orders are issued than the doctrine enunciated in Price v. Neal. In issuing postal money orders, the Government receives none of the benefits generally accorded negotiable instruments. It is not entitled to any of the privileges that generally accompany the issuance of such paper, and consequently it should not sustain or bear the onus of its burdens. In arriving at the decision herein, the Court is not unmindful of the practical difficulties which may confront banking institutions in the acceptance of money orders. The uncertainty of the integrity of money orders, although accepted and cashed by the Government, may seriously impair the mobility of these instruments in business transactions. It may be urged that the very service rendered by the Government will be hampered. However, when the Bolognesi case was decided, the Court concluded that any other view "would entail endless difficulties and losses; would be inimical to the public interest and contrary to public policy." Whether, since the Bolognesi case, the increasing use of money orders as a medium of exchange requires another view of public policy, is a matter which may be properly within the scope of legislative

enactment. In absence of such expression, it would seem that the Court should adhere to the view of public policy as indicated in the manifest weight of authority.

Plaintiff may present findings of fact and conclusions of law in harmony herewith.