**UNITED STATES of America**

v.

**The CITIZENS AND SOUTHERN NATIONAL BANK.**

**Civ. A. No. 703.**

United States District Court
S. D. Georgia, Savannah Division.

April 24, 1956.

A. Pratt Adams, Jr. (of Douglas, Adams & Adams), Savannah, Ga., Fran-

cis C. Shackelford (of Alston, Sibley, Miller, Spann, & Shackelford), Atlanta, Ga., for defendant, Citizens & Southern Nat. Bank.

Donald H. Fraser, Asst. U. S. Atty., Hinesville, Ga., for U. S.

SCARLETT, District Judge.

This is an action brought by plaintiff for the purpose of recovering $10,911.50 principal, together with interest of $1,478.23 to March 31, 1953, plus interest from that date on the principal amount at 6% per annum, on account of U. S postal money orders fraudulently issued by plaintiff's post office employee at Jesup, Georgia, payable to defendant and mailed by the employee to defendant to be deposited in his account. Defendant then endorsed and presented the money orders for payment to the United States post office, Savannah, Georgia, and the Savannah post office paid them. It is defendant's position that the loss was caused by the negligence of the plaintiff's employees; that the money orders were regular on their face, in proper form, properly stamped by a person authorized in the Jesup post office to issue money orders; and that the defendant did not know or have any reason to suspect that insufficient money was paid to the issuing post office for the money orders. Plaintiff brought this action under the provisions of Title 39 U.S.C.A. § 789. There was no allegation that the defendant was negligent in any way or had not acted in good faith, and the plaintiff was again negligent in cashing the money orders in the post office in Savannah, Georgia.

### Findings of Fact

1.

The above entitled cause came before the Court, a jury having been expressly waived. A stipulation of certain of the facts was entered into between the parties, and in addition to the stipulation evidence was introduced.

2.

Defendant, The Citizens and Southern National Bank (hereinafter frequently

referred to as "Bank"), is a national bank having its principal office in Savannah, Chatham County, Georgia.

### 3.

Plaintiff first employed Leon W. Martin as a substitute carrier on December 17, 1943, to October 31, 1945, when he joined the Air Force. He rejoined the post office on August 16, 1947, as a temporary substitute clerk-carrier and remained in its employ until March 24, 1951. Subsequent to July 1, 1950, he was on occasion permitted by the Postmaster to write money orders. On July 19, 1950, Martin issued his first fraudulent money order, this one being payable to a person other than defendant. Between the dates of July 24, 1950 and March 24, 1951, this employee of plaintiff willfully, unlawfully and fraudulently issued 130 U. S. Postal money orders, each in the amount of $100, payable to The Citizens and Southern National Bank and bearing the name of the employee, Leon W. Martin, as remitter. Each one was forwarded by plaintiff's employee to defendant to be deposited to his account in defendant Bank. On the money order applications kept by the post office at Jesup, Georgia, plaintiff's employee showed L. W. Martin as the remitter in 22 cases, Leon W. Martin as the remitter in 10 cases, 301 Cafe (a restaurant in Jesup, Georgia, in which Martin had an interest) as the remitter in 5 cases, other persons as the remitter in 90 cases and no one as the remitter in 3 cases. Martin entered on these applications kept by the post office in Jesup, Georgia, principal amounts varying between $1 and $6 and in addition entered in each case the correct fee for a money order of the size shown on the application. The total of the principal amount of the money order entered on the application and the fee was in each case paid by Martin to the post office. These payments in principal amounts aggregated $281.38; in contrast to the 130 money orders issued to defendant as payee aggregated $13,000 in principal amount.

### 4.

Each money order issued by the Jesup post office was cut off of a stub kept by that post office, the serial number of the stub corresponding to that of the money order itself. For the 8-month period during which Martin fraudulently issued the 130 money orders in question, plaintiff has the stubs of the Jesup post office for only the months of July, August and September, 1950, the stubs for the other five months involved having been destroyed by plaintiff in accordance with its normal procedure. On the stub of each fraudulent money order issued during the above mentioned three months, with one exception, there was entered the purported amount of the money order—amounts varying from $1 to $6. In the case of the one exception, serial number ———, no amount was entered. In every case in the above period these small amounts differed from the size of the money order indicated by the margin of the stub, which showed that a money order in the amount of $100 had been issued.

The money order forms then in use came in books, and were cut by a metal cutter which was designed to and clearly did show on the stub and on the money order that the particular money order did not exceed a certain amount. The left part that was bound in the book became the stub and was retained by the issuing post office. The remaining part of the form was cut from the stub when issued and hereinafter is called the "money order". Between the stub and the money order (right margin of the stub—left margin of the money order) is a vertical column of numbers, plainly set forth in a black background. The column is topped by a dollar ($) mark and under it to the bottom of the form are the numbers 1, 2, 5, 10, 20, etc., through 100. There is printed on the money order "Not Good for More Than Largest Amount Indicated on Left Hand Margin." For the above period each time a money order was issued it carried with it all of the marginal dollar figures through

the amount of the money order itself. A money order for $100 carried all the figures, leaving nothing on the stub; a correct money order for $5 would leave all of the marginal dollar figures on the stub from $10 to $100.

The margins of the money orders issued during the 5-month period for which the stubs have been destroyed by plaintiff were similarly cut to show that they were $100 money orders. However on sixteen of the money orders a portion of the dollar ($) figures at the left edge were fastened to the money order by scotch tape on the back of the money order. As they came in defendant presented for payment these sixteen money orders to the plaintiff's post office in Savannah, along with many other money orders, and plaintiff paid them without question, although from time to time it turned down other money orders presented by the defendant. It appears that the defendant was known as the "Money Order Bank" for Savannah in that all the other banks in the city turned their money orders over to the defendant daily for tabulation and collection. Plaintiff's employee, Joe Heffernan, in charge of money orders in the Savannah post office, gave the defendant a check for the total amount of money orders for that day, less the value of any money orders Mr. Heffernan returned to the Bank on account of defects from the previous day's total, all of which money orders he had individually checked. From time to time other postal money orders handled by the defendant were pieced together with scotch tape and were accepted and paid by the post office when presented to it by the defendant. The defendant was not negligent in the handling of these sixteen money orders.

### 5.

The defendant Bank knew that Martin was employed in the post office in Jesup but did not know in what capacity and the Bank also knew he was engaged in the honey business. Soon after he opened his account the Bank learned that he had an interest in a restaurant in Jesup. Vice-President Youmans of defendant testified that the amounts of the deposits were not unusual in view of the fact that Martin had several business interests and that Martin used the account to pay his regular expenses. He testified that the Bank had a number of customers in the Jesup area, especially as some of the people in Jesup were not satisfied with the only bank there at the time. Also Inspector Harris testified that Jesup was expanding. I find no circumstances which should have put the Bank on guard. Defendant received during the time in question hundreds of money orders every week for deposit or for application against installment loans of its customers. In the ordinary course of its banking business defendant received the money orders in question from plaintiff's employee payable to it for deposit to the employee's checking account. It credited the account and presented the money orders for payment to the designated paying post office in Savannah, Georgia. This post office accepted the money orders for payment and paid them according to the tenor of its acceptance. Defendant did not know and had no reason to know that the money orders were willfully, unlawfully and fraudulently issued. It accepted them in good faith as instruments issued by plaintiff upon itself.

### 6.

Postal Inspector Crawford made a check of the Jesup post office, including the money order account, about September 24, 1950. He testified that he checked from September 1, 1950, through September 20, 1950, during which period there was the largest volume of dishonest money orders. Inspector Crawford said that at least 23 dishonest money orders were written during that period. In making his regular routine check he noticed other discrepancies in Martin's money order work but did not notice how the stubs were cut or that one of the stubs involved had no amount written in the space for figures. It is interesting to note that after Inspector Crawford's visit, Martin ceased his defalcations for quite a while.

7.

The surety bond on the Postmaster at Jesup exceeded the loss and on at least two occasions the plaintiff called on the surety to pay the loss but never took any steps to enforce collection. Plaintiff's Jesup, Georgia, Postmaster, during the period from July 1, 1950, to March 24, 1951, when Leon W. Martin was charged from time to time with handling money orders, made no intermittent spot checks of the remitters and stubs of the money orders and amounts received and paid for on the money orders by the issuing and paying offices, nor as far as the evidence shows any sort of check on either Martin or the money order account. Prior to July 1950 Martin appeared to be a poor boy but after he was permitted to handle money orders he appeared in new clothes, opened a restaurant in Jesup and purchased several new automobiles, including an Oldsmobile "98".

8.

Plaintiff's money order business in 1950 and 1951, when the money orders in question were fraudulently issued, was in direct competition with the money order business of numerous private enterprises, including that of the defendant, other banks, the American Express Company and community exchange services. Defendant started selling its own money orders in 1938, selling a total of 2,175 in 1938 covering a dollar volume of $21,478; 19,070 in 1950 for a dollar volume of $1,756,928 and 20,798 in 1951 for a dollar volume of $1,858,448. Banks which are members of the Federal Deposit Insurance Corporation (all national banks and most state banks) sold 47,690,440 bank money orders in 1951; 57,044,426 in 1952 and 65,380,495 in 1953. During the period from July 24, 1950, through March 24, 1951, the following charges for money orders of varying classes were made by the post office, defendant and the American Express Company:

| Amount of Money Order | U. S. Postal Money Order | C&S Natl. Bank Money Order | American Express Money Order |
|---|---|---|---|
| $ 0.01 to $ 1.00 | $ .10 | $ .10 | $ .05 |
| 1.01 to 5.00 | .10 | .10 | .10 |
| 5.01 to 10.00 | .15 | .15 | .15 |
| 10.01 to 50.00 | .25 | .15 | .25 |
| 50.01 to 100.00 | .35 | .20 | .30 |

In spite of the fact that almost all the information as to how the loss took place was in the possession of the plaintiff, the plaintiff declined to admit anything or produce any of the evidence for inspection by the defendant until ordered to do so by the Court, and even then declined to produce the postal inspection reports covering the loss. The plaintiff's position is that any neglect of its employees or officials is not relevant and plaintiff did not really deny that the Postmaster at Jesup was negligent and long ago notified the Postmaster that he would be liable for the loss unless the dishonest employee was able to raise the money to make good the loss and on two occasions, an official of the Post Office Department wrote National Surety Corporation, the Postmaster's surety, to deposit the amount of the loss with the Post Office in Atlanta. Although Postal Inspectors in charge of the investigation examined a transcript of Martin's deposits and withdrawals in the defendant Bank right after the Post Office discovered the loss in July 1951, the plaintiff waited seven additional months before letting the defendant know what had happened and that the plaintiff was looking to the defendant to make up the loss. The plaintiff did not vigorously pursue some assets of Martin which would have reduced the loss and did not notify the defendant

until after Martin had been sentenced and too late to realize anything from his assets. If plaintiff had uncovered the fraud by the end of August, 1950, neither plaintiff nor defendant would have suffered any loss for Martin's bank balance plus his bond would have been sufficient.

9.

The post office department applied against the $13,000 of money orders fraudulently issued by its employee to defendant the $281.38 representing the total of such money orders entered on the applications at the post office; $1,000 representing a recovery of the full amount of Martin's surety bond; and $807.12 standing to Martin's credit in the Civil Service Retirement Fund. The amount of $10,911.50 sued for by plaintiff is the difference between the $13,000 and the sum of the three credits totalling $2,088.50.

I find the plaintiff's employees and agents were negligent in the following particulars:

(a) The Postmaster at Jesup trusted Martin and failed to make even a cursory examination of the money order accounts, although post office regulations require that a Postmaster closely supervise the money order business.

(b) The discrepancy between the stubs as filled out and as cut was noticeable to casual inspection and not only should have been caught by Miss Murphy, the money order clerk, but also by the Postmaster and Inspector Crawford when the latter made a check of the Jesup, Georgia, post office, including the money order account, about September 24, 1950.

(c) The Postmaster at Jesup failed to exercise adequate supervision over Martin whom he permitted to write money orders without increasing his bond over the pre-existing $1,000 bond and whom he permitted to handle money orders when no one else was present without carefully checking him.

(d) The Postmaster at Jesup was negligent in failing to check the money order account when he should have been suspicious of Martin whom he had known for years as a boy with very limited means and who, in a short period of time after he started handling money orders, appeared in new clothes, acquired an interest in a restaurant in Jesup and bought three or four new automobiles, including an Oldsmobile 98.

(e) It caused defendant, through its delay of 19 months in properly notifying defendant from the date when the first money order was fraudulently issued payable to defendant and through a delay of 7 months from the date when plaintiff itself discovered the fraud, to lose the value of all monies standing to the credit of Martin in his checking account with defendant, and to lose the value of his equity in the other assets he had, including a home, a car, plus his interest in the restaurant. The plaintiff was again negligent in its agents and employees permitting these particular money orders to be cashed at the post office in Savannah, Georgia, when the same were presented for payment.

## Conclusions of Law

This is a case in which three parties were involved. One of the parties, an employee of plaintiff, was dishonest and made off with the money. As usual, that party is not solvent and the question is which of the two honest parties should pay the loss. If the plaintiff were allowed to recover, it would mean that a party whose agents and employees were negligent could recover from a defendant who was not even charged with fault. It is perfectly clear that if the plaintiff were an ordinary citizen, the plaintiff could not recover. Likewise the sovereign as plaintiff should not recover in this case. This is not a case of the sovereign being harassed by an action being brought by one of its subjects, but is a case of the sovereign coming into Court and asking for justice. United States v. Norwegian Barque The Thekla, 1924, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313; Jones v. Watts, 5 Cir., 1944, 142 F.2d 575, 163 A.L.R. 240; United States v. Kiriaze, 5 Cir., 1949, 172 F.2d 1000; United

States v. Moscow Seed Co., D.C.Idaho 1936, 14 F.Supp. 135; Howard v. Cook, 59 Idaho 391, 83 P.2d 208, at page 211. In The Thekla, Mr. Justice Holmes, speaking for a unanimous Court, said [266 U.S. 328, 45 S.Ct. 113]:

> "When the United States comes into Court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter. The absence of legal liability in a case where but for its sovereignty it would be liable does not destroy the justice of the claim against it."

Judge Sibley on the same point, said in the opinion of the Court in Jones v. Watts [142 F.2d 577]:

> "It is well settled that when government invokes the aid of the court as a litigant it stands as any other litigant, with the same obligation to give effect to the rights of the person sued. It cannot ask the court to render a judgment or to enforce it without submitting itself to do justice."

This case is readily distinguishable from other money order cases where there is no showing of such flagrant and continuing negligence on the part of the Government as is present here and no showing of how the Government could have avoided any ultimate loss as it could have in this instance if it had not negligently overlooked the irregularity that was obvious on the face of the first and subsequent stubs of the fraudulently issued money orders. Bolognesi v. United States, 2 Cir., 1911, 189 F. 335, 36 L.R.A., N.S., 143; United States v. Northwestern National Bank & Trust Co., D.C.D. Minn.1940, 35 F.Supp. 484; United States v. Stockgrowers' National Bank, C.C.D.Colo.1887, 30 F. 912. Also there is no indication that any point was made by the defendants in these cases that they could offer all defenses against the Government as a plaintiff that they could offer against a private suitor. Here there was no forgery, raised money order,

or improper endorsement, and the Savannah post office accepted the money orders and under the circumstances of this case it would be unjust to allow the plaintiff to recover.

Having decided this case on the grounds already stated, it is not necessary to determine whether the sale of postal money orders in competition today with those of private enterprise is a commercial transaction subject to the same defenses as apply to any orders sold by private enterprise.

The plaintiff was not only negligent as hereinabove stated but was again negligent in permitting these money orders to be cashed in the post office, Savannah, Georgia.

### Judgment

It is, therefore, considered, ordered and adjudged that the plaintiff herein is not entitled to recover any amount from the defendant.